J. C. PENNEY COMPANY, a corporation, Appellant,

v.

Gerald EUBANKS, a minor, by Virginia Eubanks, his mother and next friend, Appellee.

No. 6649.

United States Court of Appeals Tenth Circuit.

July 25, 1961.

**520**

Thomas R. Brett and R. D. Hudson, Tulsa, Okl., for appellant.

E. P. Litchfield, Jr., Tulsa, Okl. (Remington Rogers and Louis J. Karey, Tulsa, Okl., were with him on the brief), for appellee.

Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.

PHILLIPS, Circuit Judge.

This is an appeal by J. C. Penney Company[1] from a judgment recovered against it by Gerald Eubanks for personal injuries. The case was tried to the court without a jury.

The accident which resulted in the injuries to Gerald occurred while he was riding on an escalator from the second floor to the first floor of the Penney Company store at Tulsa, Oklahoma. On the day of the accident, Virginia Eubanks, Gerald's mother, accompanied by him and his younger brother, went to the store to do some shopping. When she had completed her shopping, she instructed Gerald to take his younger brother down the escalator from the second to the first floor. Gerald testified that he got on the escalator with his younger brother; that they rode on the same step; that he stood on the right side and his younger brother on the left side of the step; that he held his younger brother's hand as they descended on the escalator; that as the escalator descended he was facing forward and riding in a normal manner; that he was not kicking the side panel of the escalator and was not poking his foot at the right rear corner of the step on which they were riding; that he was wearing ordinary tennis shoes, with rubber soles and fabric tops; that he felt the tennis shoe on his right foot being grabbed and pulled into the escalator between the step he was standing on and the side panel of the escalator; that he tried to pull his foot free, but was unable to do so. He demonstrated to the court how the right portion of the toe of his shoe was caught between the step he was standing on and the side panel nearer to the front edge of the step than to the rear and how, after his shoe was caught, "his body was turned around to the right facing the side panel and his heel was * * * elevated."

When Gerald first felt his shoe being caught, the escalator was about six or seven steps up from the first floor and it stopped about two or three steps above the first floor. There was testimony indicating that the escalator was stopped by a safety device, activated by the abnormal stress on the steps. By the time the escalator had stopped, Gerald's shoe had been pulled back and was lodged at the right rear corner of the step, between the step and the side panel of the escalator.

▇ Dickson, an employee of the Penney Company, went to the aid of Gerald. An effort to pull his foot free from the escalator failed. Thereupon, the escalator was reversed and Gerald's shoe and foot were removed. The trial court awarded him damages in the amount of $2,000. The evidence fully supported the amount of such award.

The right tennis shoe worn by Gerald at the time of the accident was introduced in evidence. Integral with the rubber sole portion of the shoe is a rubber side portion, which extends entirely around the shoe and upwards from the base of the sole approximately ¾ of an

---

1. Hereinafter called Penney Company.

inch. The following is an approximately accurate full-size drawing of the front portion of the shoe as it appeared after the accident.

The line indicated by dashes toward the right front of the shoe shows the outer edge of the sole as it was before the accident. The part of the sole and the rubber side portion between the line indicated by dashes and the solid line immediately to the left thereof was torn away from the shoe. That portion of the

fabric top between such solid line, the dotted line to the left side of the shoe and the dotted line in front of the lace eyelets was torn loose from the shoe. As indicated on the drawing, the right side of the sole immediately back of the portion torn away was split in two for a distance of approximately three inches.

The remaining portions of the shoe indicate that it was in good condition and not worn or frayed at the time of the accident.

The escalator was designed, constructed and installed by the Otis Elevator Company. The evidence established that the normal clearance between each side panel of the escalator and the step was 1/64 of an inch.

The Penney Company contends that the physical facts show that Gerald's toe was touching the vertical part to the rear of the step, as he descended on the escalator, and that he was either riding backwards or at an angle sideways and that the shoe must have caught in the vertical part of the step as it retracted (moved directly downward, as well as diagonally downward) in its downward movement. But, there was no evidence that the retraction of the riser of the step on which Gerald was riding would commence as high up from the bottom as six or seven steps, which was the location of the step at the time the foot was first caught. Such retraction commences about three steps up from the bottom of the escalator. Until such retraction commenced, the step moved downward in a line parallel to the side panel of the escalator and once the shoe was caught between the step and the side panel, the tendency would be to pull the shoe toward the corner of the step. Gerald's evidence fully refutes the contention that his shoe was caught in the riser. Moreover, we think the location of the damage to Gerald's right shoe, which left intact a portion of the left toe part of the shoe

and was mainly on the right side of the shoe, supports Gerald's testimony and refutes the contention that Gerald was riding either backwards or sideways. If Gerald had been facing to the rear of the step, it would have been his left and not his right shoe that would have been caught. If he had been facing toward the right side of the escalator, it is unlikely the damage to the shoe would have been to the right front and right side of the shoe, leaving the left front and left side of the shoe intact.

The trial court found that while Gerald was riding the escalator from the second floor to the first floor, his right foot caught between the edge of the escalator step and the side panel of the escalator and that as a result thereof he sustained injuries to his right foot; and that at the time his right foot was so caught he was standing on the step of the escalator in a proper manner. Those findings are supported by the evidence and are not clearly erroneous.

The trial court also found that while there was no negligence on the part of the Penney Company in the actual "operation of the escalator," the occurrence of the injury under the attendant facts and circumstances warranted the conclusion of "negligence on the part of defendant (Penney Company) in the construction and design of the escalator." We think the phrase in the findings, "operation of the escalator," when construed in the light of the context in which it is found, was intended to be limited to the actual running of the escalator and to connote freedom from faults, like, for example, excessive speed or sudden stopping; and we conclude that the court, in finding there was no negligence in the operation of the escalator, did not intend to find that the Penney Company did not operate an escalator which was negligently designed or constructed or that it was not guilty of negligence in so doing.[2]

2. The conclusion we have reached is supported by the observation made by the court in orally announcing his decision in the case when he said:

"The evidence presented of course negatives any suggestion of negligence in the operation of the escalator. In other words, there was no lurching, no sud-

■ Gerald relied on the doctrine of res ipsa loquitur. That doctrine has long been recognized in Oklahoma. In *Independent Eastern Torpedo Co. v. Gage*, 206 Okl. 108, 240 P.2d 1119, the court at page 1122, stated:

"Cases involving the application of the res ipsa loquitur doctrine are in irreconcilable conflict. This court, however, has consistently followed a liberal construction of the doctrine. * * *

* * * * * *

"The rule here involved is stated in Shearman & Redfield on Negligence, Sec. 60, as follows: 'When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from the want of care.' "

■ In National Union Fire Insurance Company v. Elliott, Okl., 298 P.2d 448, 451, the court quoted with approval from *Emigh v. Andrews*, 164 Kan. 732, 191 P.2d 901, as follows:

" ' * * * there is no dispute relative to the meaning of the words res ipsa loquitur. They simply mean "the thing speaks for itself." And that means the *thing* or *instrumentality* involved speaks for itself. It clearly does not mean the *accident* speaks for itself. * * *' "

The trial court found that at the time of the accident the escalator, or instrumentality involved, was under the complete control of the Penney Company and that under the facts and circumstances of the case the doctrine of res ipsa loquitur was applicable.

The Penney Company contends that if there was a defect in the construction and design of the escalator, it was a latent defect and that the Penney Company is not charged with the knowledge thereof, but the difficulty of the Penney Company position is that it failed to meet the burden cast on it to explain the cause of the accident. The only explanation it offered was an unjustified deduction from the physical facts. There was no proof of a latent defect and if the accident was caused by excessive clearance between the step and the side panel, it was an obvious defect.

■ We are of the opinion that the evidence fully established that the thing which caused the injury to Gerald at the time of the accident was under the complete control and management of the Penney Company, its agents and servants; that in the ordinary course of things the accident would not have happened if the Penney Company, its agents and servants, had exercised due or proper care; that the Penney Company offered no evidence or explanation of the accident sufficient to refute the presumption that it was caused by the lack of due care on its part, and that the trial court properly applied the doctrine of res ipsa loquitur.

The judgment is affirmed.

---

den stopping, or anything of that sort which we find in some of the cases as constituting a basis for a presumption of negligence in the operation. In other words, where there is evidence of lurching it suggests negligent operation—negligence in the operation, absent any specific proof of what the negligence consisted of. But here we have no unusual occurrence in connection with the operation. But the occurrence of the injury, I think, as the Kentucky court held, suggests some negligence in the construction of the escalator."