357 So.2d 1326 (1978)
Richard J. MIRE et al.
v.
OTIS ELEVATOR CO. INC. et al.
No. 8434.
Court of Appeal of Louisiana, Fourth Circuit.
April 11, 1978.
*1327 John M. Robin, Metairie, and Darryl J. Tschirn, Covington, for plaintiffs-appellees.
Drury, Lozes & Curry, James H. Drury, New Orleans, for defendants-appellants.
Before SAMUEL, REDMANN and BOUTALL, JJ.
SAMUEL, Judge.
Plaintiff, Richard J. Mire, individually and as administrator of the estate of his minor child, Michelle M. Mire, filed suit against the defendants, Otis Elevator Company, Inc., its insurer, Commercial Union Insurance Company, D. H. Holmes Company, Ltd., its insurer, Aetna Life & Casualty Company, and Lakeside Shopping Center, endeavoring to recover damages sustained by Michelle on May 6, 1974 when her foot was caught in a descending escalator, resulting in subsequent surgical amputation of the distal two-thirds of the fifth toe on her right foot.
All defendants answered and denied negligence on their part. Otis alleged plaintiff's wife was negligent in failing to properly supervise the child and asserted the wife's contributory negligence against plaintiff's recovery. Lakeside Shopping Center, D. H. Holmes Company, and Aetna filed a similar answer. In addition, they filed a reconventional demand against plaintiff seeking indemnification or contribution from him on the theory of his wife's negligence and a third party petition against Otis seeking indemnity or contribution on the basis of the escalator maintenance contract between Otis and D. H. Holmes Company.
The case was tried before a jury, which rendered a verdict against Otis Elevator Co., Inc. for $50,000. Judgment was rendered against Otis Elevator and Commercial Union Insurance Company, in solido, on the verdict, and from that judgment they have taken this appeal. The jury held in favor of all other defendants and dismissed the suit as to them.
The evidence establishes that plaintiff's wife and their two children went to D. H. Holmes Company to purchase a present. Mrs. Mire and the children had the present gift wrapped and were descending an escalator to the first floor when Michelle's foot became wedged between the escalator's metal treads and its porcelain coated skirt or sidewall. While the evidence is contradictory, it appears the child's foot became so wedged approximately one-third of the way down the escalator and the escalator did not stop moving until the child's foot was approximately three steps from the bottom.
The child was wearing a tennis shoe which was destroyed in an effort to free her foot. However, the evidence indicates the shoe was relatively new and was not excessively worn. The child's foot had to be freed by prying it from the escalator with a large screwdriver and crowbar.
*1328 The primary conflict in the evidence centered around the width between the side of the step tread and the adjacent skirt. Roger L. Harris, the maintenance supervisor for Otis (who was qualified as an expert witness) testified that when he inspected the escalator after the accident the clearance on each side of the steps varied from one-eighth of an inch to three-sixteenths of an inch, the latter width being less than that allowed by the three-eights of an inch requirement of the American National Standard Safety Code for elevators and escalators. He expressed the opinion that because the child's mother was inattentive the child improperly placed a toe of her tennis shoe in the three-sixteenths inch crack, which caused the rubber shoe to be pulled into that crack between the escalator step and the skirt wall. He amplified on this opinion by pointing out the force of the shoe entering the crack could have forced the tread to the left, doubling the size of the crack since an equal space was allowable by the safety code on either side of the escalator tread. Under such circumstances, a space of three-eighths of an inch would have opened up to allow the shoe to enter.
On the contrary, the plaintiff, himself a civil engineer, testified the same day the accident occurred he went to the scene, rode the escalator, and observed that the space between the tread and the side skirt on the right side varied from a one-eighth inch opening at the top of the escalator to three-quarters of an inch, a quarter of the way down from the top of the escalator, from which point the crack tapered down to approximately one-eighth inch at the bottom near the escalator's base plate.
The jury's verdict indicates it believed the testimony of Mr. Mire, that the gap between the escalator tread and the side skirt was as wide as three-quarters of an inch and not merely three-sixteenths of an inch as testified by Otis' witness. Eye witness testimony confirmed the child's foot was in fact wedged between the escalator tread and the side skirt, and the jury was well within its discretion in concluding an opening as large as three-quarters of an inch in fact existed at the time she descended the escalator. While violation of the American National Standard Safety Code is not of itself negligence, again the jury did not abuse its discretion if it considered the standards set forth in that code as a benchmark to determine whether the opening between the tread and the skirt wall was excessively wide.
Testimony regarding the existence of a defect in the escalator, particularly with regard to the clearance between the tread and the skirt wall, was in direct conflict, thereby increasing the importance of the credibility of the witnesses. When there are two conflicting factual situations presented at a trial, the trier of fact has much discretion in exercising its function of resolving these conflicts, and its findings will only be disturbed where it commits a clear abuse of its discretion.[1] The evidence presented to the jury in the present case indicates it did not abuse its discretion in finding Otis was negligent in the maintenance of the escalator.
The evidence also shows with little contradiction that Mrs. Mire was not guilty of negligence in supervising Michelle. She was in the store with Michelle and a younger daughter. As she descended the escalator with the wrapped present and the two children, the younger child was held by the hand on Mrs. Mire's left side, and Michelle was stationed on her right side. Mrs. Mire was holding the package in her right hand, but testified she could feel Michelle standing against her right side. The jury specifically found Mrs. Mire was not guilty of negligence by descending the escalator in this fashion, and there is nothing in the record to justify disturbing that finding.
Otis argues the jury verdict was based on mere sympathy without factual foundation and requests the verdict be either reversed or reduced. Our review of the record indicates Otis' position is not correct.
*1329 Michelle's foot, and particularly the last two toes thereof, became wedged tighter and tighter between the metal tread and the side wall of the escalator. She screamed and cried both from pain and fright as the escalator descended and tightened on her foot. Neither she nor Mrs. Mire knew when, if at all, the escalator would be stopped. After the escalator finally stopped, the child's foot was wedged in the mechanisms so that manual efforts to free it were not successful. As Mrs. Mire tried to calm the child, attempts were made to cut the shoe away with scissors in the hope of freeing her foot. The escalator was then reversed with a jerk in an equally unsuccessful effort to free the foot. Eventually, a crowbar and oversized screwdriver were used to pry the foot from the escalator's mechanism. Michelle was both conscious and aware during this protracted procedure.
Her foot was removed from the shoe, which remained in the escalator mechanism. Upon being removed, the foot was wrapped in a towel. Mrs. Mire and Michelle were detained at the shopping center without medication for a substantial time to answer questions for defendants' insurance reports. They were then driven to the hospital in a circuitous route by a well-meaning store patron who was not familiar with the area.
When Michelle arrived at the hospital she was very anxious about the condition of her foot and expressed great desire to see if her toe was still there. Medical personnel in the emergency room advised Mrs. Mire not to let the child see her foot in its damaged condition. In addition to the crushed toe, the child's foot and other toes were contused and abraded. The wound was cleaned, x-rays were taken, and the child was admitted to the hospital.
Mrs. Mire testified Michelle spent a fitful first night in the hospital and it was necessary for her to hold the child the entire night to comfort her even though analgesics had been administered. The child cried in her sleep and awoke on several occasions complaining of pain. Thereafter, she was required to remain quiet with her right leg elevated. She remained hospitalized for ten days. On the seventh day she underwent surgery for the amputation of the distal two-thirds of her right little toe and debridement of skin from her right foot. On advice of her physician, the child was allowed to observe her toe preoperatively on a daily basis and watched it blacken with gangrene. After the operation, her foot was bandaged, and she was allowed first the use of a wheel chair and then the use of crutches. She experienced pain throughout her hospitalization and subsequent thereto, and expressed bewilderment over the pain and her injury in general.
One of plaintiff's physicians cautioned against the "psychological aftermath of hospitalization and notably the potential psychological overlay or impact resulting from a partially amputated toe in a young female." Mrs. Mire testified the child has incurred behavioral difficulty from the amputation, which is particularly accentuated by comments from her friends and neighbors regarding the ugliness of the remaining stump. On her physician's advice, the child's parents have attempted to overcome the negative effects of the disfigured foot and to reestablish the child's self-esteem and confidence by private swimming lessons, dance lessons, acrobatic training, and other confidence building activities. There is little doubt, however, she will continue to have adjustment problems as she matures and grows into adolescence.
Under all of these circumstances, and in view of the great discretion afforded the trier of fact in assessing damages, we cannot say the jury was erroneous in awarding $50,000 for pain and suffering and for the permanent disfigurement with which this female child must cope over the remaining years of her life.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] See Canter v. Koehring Company, La., 283 So.2d 716.