**SCHINDLER ELEVATOR CORPORATION,**
Appellant,

v.

**Scott ANDERSON and Diana Anderson, Individually and as Next Friends of Scott "Scooter" Anderson, Appellees.**

No. 14–98–01286–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 16, 2001.

Dissenting and Concurring Opinions on Denial of Rehearing En Banc April 4, 2002.

David B. Weinstein, David R. Tippetts, David J. Healey, Lisa S. McCalmont, Houston, for appellant.

George Chandler, Lufkin, Sam W. Cruse, Jr., Houston, Michael A. Hatchell, Tyler, Price Ainsworth, Austin, Scott Kidd, Houston, for appellees.

Panel consists of Justices DRAUGHN, SEARS, and LEE.*

## OPINION

JOE L. DRAUGHN, Justice.

In this appeal, Schindler Elevator Corporation challenges a judgment in favor of Scott and Diana Anderson and their son, "Scooter," for injuries they received when Scooter's foot lodged in an escalator, which tore off his foot's skin and three toes. After a jury awarded the Andersons $16.97 million, the trial court remitted the award to $5.4 million. Schindler appeals in thirteen points of error, contending (1) the evidence of proximate cause is both legally and factually insufficient; (2) the evidence supporting the jury's apportionment of liability is both legally and factually insufficient; (3) the statute of repose barred submission of strict liability questions; (4) the trial court improperly phrased a statute of repose question; (5) it was error to submit jury questions about post-sale strict products liability; (6) the escalator was not the producing cause of Scooter's accident; (7) and (8) there is legally and factually insufficient evidence for failure to warn at the time the escalator was installed and at the time of the accident; (9) the trial court erred in admitting expert testimony; (10) the trial court erred in admitting an audio-muted episode of "Dateline" in which escalator side guards were demonstrated; (11) the trial court erred in permitting incurable, improper jury argument; (12) the evidence supporting Scooter's future mental anguish and his father's past loss of consortium is both legally and factually insufficient; and (13) the evidence supporting the jury's damage award of $16.97 million is legally and factually insufficient. The Andersons bring one cross-point, contending that the trial court erred in remitting past and future medical costs, future pain and mental anguish, and Scott Anderson's loss of consortium.

We affirm in part and reverse and remand in part because: (1) the trial court did not err in admitting the portion of the muted Dateline video; (2) the trial court did not err in finding the Andersons' expert qualified; (3) Schindler did not preserve error to complain about the reliability of this expert's testimony; (4) one of the Andersons' rebuttal arguments was permissible, given the evidence, and required an objection to preserve any error; (5) the other argument, though improper, did not fall into the narrow category of incurable argument; (6) there is sufficient evidence of proximate cause; (7) there is inadequate briefing to address a sufficiency challenge to the jury's apportionment of liability; (8) there is sufficient evidence of Scooter's future pain and mental anguish and Mr. Anderson's loss of consortium; (9) the

* Senior Justices Joe L. Draughn, Ross A. Sears, and Norman Lee sitting by assignment.

amount of damages awarded was supported by the evidence; (10) the trial court erred in remitting past and future medical costs, future pain and mental anguish, and Mr. Anderson's loss of consortium; and (11) issues regarding strict liability are moot. Because of our conclusions, we reverse and remand that portion of the judgment that remitted the awards for Scooter's past and future medical costs, future pain and mental anguish, and Mr. Anderson's past loss of consortium, and we affirm the remainder of the judgment. We remand for calculation of the damages in accordance with this opinion.

## BACKGROUND

One Saturday afternoon, four-year-old Scooter Anderson accompanied his father to his office in a downtown Houston skyscraper. When leaving the building, Mr. Anderson and Scooter rode down an escalator, which was maintained by Schindler under a contract with the building's owner.[1] Scooter was standing beside his father, one step behind, or against the side of the escalator as he hung over its handrail, when his tennis-shoe-clad foot came in contact with the side skirt of the escalator.[2] In an instant, his foot was dragged into a widening gap between the escalator step and the side skirt, which entrapped his foot as the escalator continued its downward movement. This shearing movement "degloved" Scooter's foot, dragging off toes and skin. Scooter was rushed to the hospital, where doctors amputated three of his toes, inserted a pin into a fourth broken toe, and engrafted skin in five operations to save his two remaining toes and the ball of his foot.

The Andersons learned that foot entrapments on escalators, while not often as severe as Scooter's, have been long-known to Schindler and the escalator industry.[3] Entrapment is the second most common accident on escalators, after falls, and occurs some 1,000 times annually. For children especially, who have small feet and often wear rubber shoes, entrapment is an inherent risk of escalators.[4]

There are several ways to battle the likelihood of entrapment. The gap between the steps and the skirts of the escalator must be narrow, an adjustment made after installation by moving the skirts. The sides can be lubricated with silicon spray to lessen friction. The skirts can be made of a material that is less likely to give or deflect. Further, escalators can be fitted with a side-step safety plate, which affixes to the side of the step and helps to fill the gap between the step and the skirt. Steps can be painted with footsteps in the center and warning stripes along the edges

1. The building owner, Metropolitan Life Insurance, was found not negligent by the jury and is thus not a party to this appeal.

2. A witness described Scooter as hanging over the handrail while standing on his toes. Our research uncovered an entrapment case in which the child was facing the side of the escalator, standing on his toes. *J.C. Penney Co. v. Eubanks*, 294 F.2d 519, 520 (10th Cir. 1961). However, the child was apparently pulled into that position after the escalator entrapped his tennis-shoe-clad foot. *Id.*

3. *See, e.g., Martin v. Maintenance Co.*, 588 F.2d 355 (2nd Cir.1978) (10–year–old child's

4 toes and part of foot amputated after entrapment); *Brown v. Sears, Roebuck & Co.*, 514 So.2d 439 (La.1987) (2–year–old child with finger entrapped); *Mire v. Otis Elevator Co.*, 357 So.2d 1326 (La.Ct.App.1978) (child's toe amputated after foot entrapment); *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776 (Ky.1984) (10–year–old's big toe amputated after entrapment).

4. *See, e.g., Gillam v. J.C. Penney Co.*, 341 F.2d 457, 460 (7th Cir.1965) (Westinghouse admitted that rubber shoe entrapments had and continued to occur, but "nothing could be done" to prevent such accidents).

to encourage proper standing positions. Raised cleats exist along the edges of some escalator steps to make it less comfortable to stand near the edges. Larger, more explicit warning signs have also been discussed in escalator industry safety meetings.

For this escalator, however, Schindler did not install the safety devices, paint, or provide more explicit warnings. Instead, Schindler relied on gap maintenance and lubrication. The escalator was a Westinghouse model, designed to run with a gap of 1/16 to 1/8 of an inch.[5] Schindler generally operated it with 3/16 of an inch gap on either side of the steps, the widest amount permitted under industry standards. After Scooter's accident, however, one expert measured gaps of up to 1/4 inch on the escalator. Although Schindler recommended lubrication at least once a month, and its Houston technicians preferred twice a month, work records showed that the escalator had not been lubricated from between forty-two days to six months. Further, the year before Scooter's entrapment, the building owner dedicated excess funds to upgrading the escalators. Instead of making the escalators safer, Schindler used the money to make the escalators quieter.

Evidence also showed that Schindler, in the 1980s, acknowledged that its escalators could be considered "unreasonably dangerous." The president of its American operations recommended buying side-step safety plates for all its escalators. However, Schindler reneged on a contract to buy side-step safety plates created by Carl White, a long time figure in the escalator and elevator industry.

Given this evidence and more, the jury in this case, by a margin of ten to two,

found Schindler negligent, grossly negligent, and strictly liable for design and marketing defects. It apportioned 90% of the fault for the accident to Schindler and 10% to Mr. Anderson. It awarded a total of $16.97 million in actual damages and $100,000 in punitive damages. The trial court, using a mathematical formula, then remitted the actual damages to $5.4 million (net of reduction for apportionment of fault, settlement credits, and prejudgment interest) and reduced the punitive damages to zero.

Schindler's appellate issues address almost all portions of the trial. Thus, we first address the issues for which our determination affects later issues: admission of the Dateline videotape and expert testimony. We then address evidence of proximate cause, jury argument, and evidence of damages (including whether certain damages should have been remitted).

## DATELINE VIDEO

■■■ In its tenth issue, which we address first, Schindler appeals that the trial court erred in admitting a muted videotape of the television show "Dateline." Schindler contends that the video was irrelevant, unfairly prejudicial, improperly bolstered expert credibility, and aroused jury speculation about the "enormity" of escalator entrapments. Of these objections, it did not raise bolstering at the trial level. We address only the relevancy and unfair prejudice, as we consider the jury's perception of the extent of escalator problems to be part of the latter objection.

From the record, it is apparent that the trial court allowed the Andersons to play only a portion of the Dateline story. In this portion, the Andersons' expert, Carl

---

**5.** This evidence is echoed in other entrapment cases. *See, e.g, Eubanks,* 294 F.2d at 521 (Otis escalator to run with 1/64 of an inch gap); *Nettrour v. J.C. Penney Co.,* 146 Colo. 150, 360 P.2d 964 (1961) (gap of 1/16 to 1/8 of an inch is permissible)

White, rides down an escalator fitted with the side-step safety plates that he invented. In the videotape, he also demonstrates how the plate attaches to the escalator steps. Relevant evidence is that which makes the "existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence." TEX.R.EVID. 401. During trial, Schindler repeatedly contested whether Mr. White's side-step safety plates worked in their use on public escalators. It insinuated that when used, Mr. White's plates cause the escalator steps to crash and lock. Thus, the muted videotape was relevant to show the plates at work.

■ As to the objection that the videotape was unfairly prejudicial, we liken it to the admission of photographs: "[r]elevant photographic evidence is admissible unless it is merely calculated to arouse the sympathy, prejudice, or passion [of] the jury where the photographs do not serve to illustrate disputed issues or aid the jury in understanding the case." *Ford Motor Co. v. Miles,* 967 S.W.2d 377, 389 (Tex.1998). Here, the videotape was not calculated to arouse sympathy, prejudice, or passion. Further, Carl White's testimony had already established that he had appeared on Dateline. The trial court did not err in admitting the video, and we overrule issue ten.

### EXPERT QUALIFICATIONS & RELIABILITY

■ In its ninth issue, Schindler contends that the trial court erred in admitting the testimony of Carl White because (1) he was not qualified to testify about escalator design, maintenance, or accident causation and (2) because his testimony was not reliable. The Andersons offered Mr. White's opinions about failure to lubricate the escalator skirts, failure to maintain a small enough gap along the escalator step edges, failure to recommend upgrades to the escalator, and how these caused Scooter's foot entrapment.

### A. Qualifications

■ Texas Rule of Evidence 702 permits an expert witness to testify on scientific, technical, or other specialized subjects if the testimony would assist the jury in understanding the evidence or determining a fact issue. The proponent of the testimony has the burden to show that the expert possesses special knowledge on the very matter on which he proposes to give an opinion. *Broders v. Heise,* 924 S.W.2d 148, 152–53 (Tex.1996). Schindler contends that Mr. White should not have been permitted to testify about design characteristics of escalators, proper escalator maintenance, risk reduction, or causation. We review the trial court's acceptance of a witness's qualifications for abuse of discretion.

The evidence shows that Carl White's experience with escalator safety began in 1957, when he began work for Westinghouse, the manufacturer of the escalator model in this case. He completed a one-year study program there about construction and maintenance mechanics, various aspects of installation, and field surveying. Until 1963, he called upon architects, engineers, developers, and designers about sale, layout, and installation of escalators and elevators. During this time, he also worked in the field of escalator safety, and he performed accident investigation in south Florida for Westinghouse.

From 1964 to 1977, White was the president and co-owner of his own elevator contracting company, which installed some 1,200 escalators and elevators. In 1978, he became a regional vice-president for the oldest and largest elevator/escalator con-

sulting firm in the world. In 1984, he began consulting on his own.

He has held numerous memberships in the escalator and safety industries, including: chairman of the Florida Industrial Commission's elevator and escalator safety conference; Escalator and Moving Sidewalk Committee of the American Society of Mechanical Engineers (on which he helped promulgate escalator warning signs); the National Association of Elevator Safety Authorities & Inspectors; and the American Society of Safety Engineers. He is licensed as a master elevator and escalator installation and maintenance man. He has presented seventeen speeches about escalators and escalator safety at industry meetings, including a Houston conference of the National Association of Elevator Safety. He has written seven industry papers about escalator safety. He holds two patents (in the United States, Canada, and Italy) for his side-step safety plates. He has appeared on four national television shows about escalator safety issues.

Schindler complains that White is not qualified to testify because (1) White is not an engineer, has never designed an escalator, and did not design nor test his own safety device; (2) has never personally maintained an escalator, installed or maintained his safety device, and his company "avoided escalator maintenance" when possible; and (3) is not trained in accident reconstruction or causation analysis.

 However, a witness need not have a college degree to qualify as an expert. *Glasscock v. Income Prop. Serv.*, 888 S.W.2d 176, 180 (Tex.App.—Houston [1st Dist.] 1994, writ dism. by agreement). Nor is it a prerequisite that an expert witness be an escalator designer to testify about escalator safety and foot entrapment. *See Murphy v. Montgomery Elevator Co.*, 957 S.W.2d 297, 299 (Ky.Ct.App.

1997) (mechanical engineer qualified to testify that lack of skirt stiffeners and silicon lubricant made escalator defective, although he admitted to inexpertise on design, manufacture, servicing, and maintenance of escalators); *see also Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex.1998) (giving example that an experienced car mechanic's diagnosis of problems with a car's performance may well be admissible without resort to engineering principles). In fact, the design engineer of the escalator in question testified that gap adjustment is a "part of field operation," which is one of the areas of Mr. White's expertise. Further, whether White performs escalator maintenance himself, he has a master license to do so. Lastly, Schindler provides no authority that an expert must be specially trained in accident reconstruction or "causation analysis" to testify about causation. Mr. White's extensive experience in the escalator industry, his licensing, and his knowledge about escalator safety issues qualify him to discuss the industry-acknowledged problem of side-step entrapment; escalator mechanics, installation, and maintenance; and risk reduction. From this expertise, he was also qualified to testify that Scooter's own side-step entrapment was caused by excessive gap and inadequate lubrication. The trial court did not err in finding Mr. White qualified in these areas.

There is one remaining area of escalator design about which Schindler contends that Mr. White was unqualified to testify: the rigidity of the metal side skirts. In his direct testimony, Mr. White testified that deflection of the side skirt is one of four factors in foot entrapment on escalators. While most of his testimony on direct focused on two other factors, excessive gap (the most important factor to White) and silicon lubrication, Mr. White briefly testified, "I believe that the skirt panel rigidity

was defective in the design." On cross-examination, Schindler's questions allowed Mr. White to expound upon the brief testimony: given the size and thickness of Scooter's shoe, even if the gap was 3/16 of an inch, Mr. White believes that Scooter's foot would never have been caught unless the skirt bent outward, creating an even larger gap into which the foot was dragged. Mr. White believes that a sturdier side skirt would not deflect, thus minimizing the possibility of a side-step entrapment.

■ We reject Schindler's argument about Mr. White's qualifications to testify about skirt strength for several reasons. First, Mr. White's testimony about the side skirt was based on his knowledge about escalator mechanics, maintenance, and installation and previous experience with side-step entrapments. His thought process regarding the gap, width of Scooter's shoe, and bending of the skirt was one of logic and experience, not requiring engineering principles for explanation. *See Gammill*, 972 S.W.2d at 720.

Second, even if the trial court erred in allowing Mr. White to testify about side-skirt strength, error in admitting evidence is harmless if the same evidence appears elsewhere in the record. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). Schindler's own expert, the man who designed the escalator model in question, testified that Scooter's foot acted as a wedge, exerting between 500 to 1000 pounds of spreading force on the skirt. He testified that the metal skirt in question would deflect 3/64 of an inch with just 150 pounds of force pushing on it and that in a side-step entrapment, "[e]verything bends and opens up under this terrific force you have."

Third, if admission of Mr. White's testimony on skirt strength was error, Schindler must show that the error probably caused the rendition of an improper judgment. Tex.R.App.P. 44.1(a). To determine whether error was harmful, we review the entire record. *Id.* After reviewing the entire record, including the testimony from Schindler's experts, we do not agree that admission of Mr. White's testimony on skirt strength, if error, probably caused the rendition of an improper judgment. The main focus of Mr. White's testimony on causation was excessive gap and inadequate lubrication. For these reasons, we overrule Schindler's point of error regarding Mr. White's qualifications as an expert.

### B. Reliability

■ Next, Schindler argues that Mr. White's testimony was unreliable in four "glaring" areas: excessiveness of the gap, lack of lubrication, skirt strength, and poor maintenance. For expert testimony to be admissible under Rule of Evidence 702, it must be relevant and reliable. *Gammill*, 972 S.W.2d at 726. The Andersons argue that Schindler failed to preserve error, but Schindler contends it objected before, during, and after trial in ways that encompassed the reliability of Mr. White's testimony.

■ First, Schindler states that it objected in a motion in limine. However, the record does not contain the trial court's ruling on the motion in limine. Further, a motion in limine that has been overruled does not preserve error regarding evidence that is admitted at trial. *Hartford Accident & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex.1963). Second, Schindler claims that its pretrial motion to partially exclude Mr. White's testimony encompasses objections to the reliability of his testimony. We disagree. The pretrial motion, which the trial court overruled just before Mr. White's testimony, focused on his qualifications, or lack thereof, not reliability of his testimony.

Third, Schindler states that it objected numerous times throughout trial to the lack of foundation for Mr. White's testimony. Because it did not obtain a running objection, to preserve error, Schindler had to object on that basis each time allegedly inadmissible evidence was offered. *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984). Of the "four glaring areas" of which Schindler complains on appeal, we have found numerous instances of such testimony where Schindler failed to object to lack of foundation.

Fourth, Schindler contends that because it objected to qualifications and sometimes to reliability, the issue of reliability was properly before the trial court. We disagree. In *Robinson*, the Texas Supreme Court stated that *in addition* to qualifications, an expert's testimony must be relevant to the issues and based upon a reliable foundation. *E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). We believe that objections to qualifications are thus distinct from objections about reliability. *But see Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 932–33 (Tex.App.—Texarkana 1997, pet. denied) (holding that court must perform gatekeeper function without regard to the parties' arguments). Schindler cites *General Motors Corp. v. Sanchez* for the proposition that when at least some objections are made to reliability, the issue is preserved. 997 S.W.2d 584, 590–91 (Tex.1999) (citing *Merrell Dow Pharm. v. Havner*, 953 S.W.2d 706, 711–14 (Tex.1997)). We have examined both *Sanchez* and the portion of *Havner* that it discusses. In *Havner*, the "central issue" of the litigation was the scientific reliability of the expert testimony offered to establish causation between a drug and birth defects. 953 S.W.2d at 708. In this case, there is no such central issue. In *Havner*, the defendants *fully* briefed the issues and the trial court held a lengthy pre-trial hearing. *Id.* at 709.

Here, we have neither full briefing nor a pre-trial hearing on reliability.

■■■ Finally, although Schindler provides several record references to show that it objected, at times, to lack of a reliable foundation, these objections (with one exception) were directed to expert testimony in areas other than the four which Schindler focuses on in its appeal. If occasional objections preserved error for admission of testimony, surely those objections should be lodged against the testimony complained of on appeal. The complaint on appeal must be the same as that presented to the trial court. *Rogers v. Stell*, 835 S.W.2d 100, 101 (Tex.1992).

In conclusion, objections to qualifications do not encompass whether the expert's testimony is based on a reliable foundation. Objecting only at times does not preserve error as a running objection does. And, if such sporadic trial objections could preserve error, they should at least be directed to the testimony complained of on appeal. To allow a reliability challenge here "would deny [the plaintiffs'] experts the opportunity to 'pass muster' in the first instance and usurp the trial court's discretion as 'gatekeeper.'" *Sanchez*, 997 S.W.2d at 591 (quoting *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 410–11 (Tex.1998)). Accordingly, we disagree with Schindler that it preserved error to appeal the reliability of Mr. White's opinions.

Having found that the trial court did not abuse its discretion in finding Mr. White qualified and that no error was preserved to appeal reliability, we overrule Schindler's issue nine.

## JURY ARGUMENT

■■■ In its eleventh issue, Schindler appeals that the Andersons' rebuttal argument to the jury was improper and incura-

ble. In presenting this argument, Schindler has the "burden to prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) [that] was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge." *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). Schindler argues that the argument was incurable, as it must, because it did not object in the trial court. Where argument is incurable, no objection is necessary to preserve error, *Clark Equipment Co. v. Pitner,* 923 S.W.2d 117, 125 (Tex.App.—Houston [14th Dist.] 1996, writ denied), although improper jury argument not otherwise ruled on by the trial court must be raised in a motion for new trial. Tex.R.Civ.P. 324(b)(5). Incurable jury argument occurs when comments are so inflammatory that their harmful nature cannot be cured by an instruction to disregard. *Melendez v. Exxon Corp.,* 998 S.W.2d 266, 280 (Tex. App.—Houston [14th Dist.] 1999, no pet.). "There are only rare instances of incurable harm from improper argument." *Reese,* 584 S.W.2d at 839.

In its motion for new trial, Schindler raised as improper the Andersons' argument in which their attorney gave a "historical perspective of products liability cases." As part of this perspective, the Andersons discussed "the things American juries have done" to make America safer, including stopping Ford Pintos, asbestos in buildings, Dalkon shields, flammable baby clothes, suspension football helmets, Agent Orange chemicals, and exploding Drano cans. Schindler also contends that the following "send a message" arguments are improper and incurable:

> I am convinced with your verdict when you reach the truth that you will send a message loud and indubitably clear to the escalator industry [that] they can't carry this charade on anymore. Its been uncovered and they are going to make those escalators reasonably safe.
>
> . . . .
>
> You are the conscience of this community. . . . It is very unlikely that you will have the opportunity to serve mankind as much as you will have in this case, to do so much good for children. If your verdict is large enough, they'll listen to it and they'll make changes.
>
> . . . .
>
> It's been said that a pencil in the hands of a foreperson of an American jury is more powerful than all the armies that ever marched and all the navies that ever sailed and one of you will hold that power. I beg you to write justly, be proud, and when you go home, all of you, . . . and your family asks you, what did you do in court, you can look them in the eye and say, here's what I did in court. I made this community and this world a safer place to live and because I helped make it safer for the little people.

First, regarding the arguments to send a message to the escalator industry, such arguments have been held to be within the logical parameters of a closing argument when based on the facts. *See, e.g., Rodriguez v. Hyundai Motor Co.,* 944 S.W.2d 757, 774 (Tex.App.—Corpus Christi 1997), *rev'd on other grounds,* 995 S.W.2d 661 (Tex.1999) (in which Hyundai appealed to jury to send a message to Texas that, contrary to general presumptions, justice is not for sale in its county); *see also Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 342–43 (Tex.1998) (plea for high damages award to "send a message" was not so prejudicial to the actual damages claim as to require a reversal because of evidence existing on the issue of liability).

Here, the evidence showed many earlier injury lawsuits against escalator companies, including Schindler, many industry-wide entrapments of children, and refusal of the escalator companies, including Schindler, to adopt certain safety measures. In particular, the evidence includes a ten-year-old letter from Schindler's president that recommends adopting the White side-step safety plates as a standard feature; that remarks "is a down moving escalator without side plates 'unreasonably dangerous?' Probably yes!"; and that opines that "a major magnitude claim is coming from an escalator accident involving entrapment between the steps and skirt." The evidence also showed that Schindler later backed out of negotiations with Carl White to fit its escalator lines with side-step safety plates. Finally, the jury was aware that several other escalator manufacturers had provided Schindler with witnesses for this case, all of whom supported Schindler's defense that it bore no fault for Scooter's accident.

Additionally, even if error, this court has previously found that an objection is necessary to appeal such "send a message" arguments. *Gannett Outdoor Co. of Texas v. Kubeczka,* 710 S.W.2d 79, 86 (Tex. App.—Houston [14th Dist.] 1986, no writ). We conclude that the Andersons' argument was based on the evidence. Further, if error, such a "send a message" argument requires an objection to preserve error.

The Andersons' specific reference to litigation such as Ford Pintos, asbestos, and Dalkon shields was error, however. *See City of San Antonio v. Rodriguez,* 934 S.W.2d 699, 705 (Tex.App.—San Antonio 1995) *rev'd per curiam on other grounds,* 931 S.W.2d 535 (Tex.1996); *Clark Equipment Co.,* 923 S.W.2d at 125; *Lone Star Ford, Inc. v. Carter,* 848 S.W.2d 850, 853–55 (Tex.App.—Houston [14th Dist.] 1993, no writ). It was also not invited or provoked. Thus, we must determine whether the error could have been cured by a proper instruction or whether "the probability that the improper argument caused harm is greater then the probability that the verdict was grounded on the proper proceedings and evidence." *Reese,* 584 S.W.2d at 840. We must evaluate the improper jury argument in light of the whole case, beginning with voir dire and ending with closing argument. *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 120 (Tex.1984).

First, we are unconvinced that the argument could not have been preempted and cured by an objection and instruction to disregard. *See Cecil v. T.M.E. Investments, Inc.,* 893 S.W.2d 38, 48–49 (Tex. App.—Corpus Christi 1994, no writ) (argument about lawsuit abuse, to which plaintiff failed to object, was not incurable). For instance, in *Clark Equipment,* a single mention of Pinto cases was interrupted by the defendant's objection and cured by the trial court's instruction to disregard. 923 S.W.2d at 125. While the Andersons' argument was far lengthier and detailed, a timely objection by Schindler would have allowed the court to stop this argument and cure it. We are troubled with allowing a litigant to "lay behind the log" and allow an obviously erroneous argument to develop fully in the hopes that it will become incurable.

Second, we do not think the probability this argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. There was substantial, uncontroverted evidence that side-step entrapments were known to Schindler and the industry from the time of the escalator's invention. Even Schindler's witnesses acknowledged that entrapment is more likely in children, who have smaller feet, hands,

and fingers and who frequently wear rubber shoes that grab the side skirt on contact. There was evidence that safety measures existed, such as painted stripes along the step edges, painted footprints in the center of the steps, or side-step safety plates, which Schindler did not recommend for this escalator. There was also evidence that the gap was excessive and lubrication inadequate.

Further, despite the Andersons' rebuttal, and Schindler's own somewhat fanciful closing argument, the jury carefully reached its verdict with favorable and unfavorable findings to all sides: it found Scott Anderson at fault; Met–Life fault free; no design defect when the escalator was installed; zero damages for Diana Anderson; zero damages for Scott Anderson's future loss of consortium, future mental anguish, and exemplary damages; and zero damages for Scooter's loss of earning capacity. The amounts awarded for past and future medical expenses are consistent with the testimony. The amounts awarded to Scooter in damages are substantial, but whether these amounts are excessive is addressed in other points of error.

Given the evidence and that the careful verdict reached by the jury demonstrates its attention to it, we hold that the Andersons' rebuttal argument about other product liability litigation does not fall into the narrow category of incurable argument necessitating reversal for a new trial. We overrule issue eleven.

### PROXIMATE CAUSE

In issue one, Schindler contends that there is legally and factually insufficient evidence of proximate cause.

### A. Standard of Review

In determining a legal sufficiency issue, we are to consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); *Havner,* 953 S.W.2d at 711; *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law. *Formosa Plastics Corp.,* 960 S.W.2d at 48; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

A legal sufficiency issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Havner,* 953 S.W.2d at 711 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

An assertion that the evidence is "factually insufficient" means that the evidence supporting a finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside as clearly wrong and unjust and a new trial should be ordered. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We are required to consider all of the evidence in the case in making this determination.

*Maritime Overseas Corp.*, 971 S.W.2d at 406.

## B. Law and Evidence of Causation

To prevail on a negligence claim, a plaintiff must prove that the defendant proximately caused the injury. *Leitch*, 935 S.W.2d at 118. "Proximate cause consists of cause in fact and foreseeability." *Id.* "The cause-in-fact element of proximate cause is met when there is some evidence that the defendant's 'act or omission was a substantial factor in bringing about injury' without which the harm would not have occurred." *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex.1998) (quoting *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995)). Schindler claims that there is insufficient evidence that it was a substantial factor in causing Scooter's accident.

The Andersons identify three categories of Schindler's negligence that caused Scooter's injury: (1) failure to adequately lubricate the escalator sides with silicon; (2) failure to maintain a small enough gap on the edges of the escalator steps; and (3) failure to install recommended upgrades. We hold that there is legally and factually sufficient evidence that Schindler's negligence was a substantial factor in causing Scooter's accident.

First, Schindler's own escalator maintenance supervisor testified that the purpose of lubricating the skirts was to prevent entrapment. According to the Andersons' expert, failure to adequately lubricate the skirts "dramatically increases" the chances of entrapment. Schindler's policy was to lubricate the skirts once a month, though its two mechanics assigned to maintain the escalator in question believed it more prudent to lubricate every two weeks. Regardless, maintenance records support the conclusion that the escalator had not been lubricated from forty-two days to six-and-a-half months before Scooter's accident. The Andersons' expert testified that the escalator was inadequately lubricated and stated, "Scooter's foot wouldn't have gotten caught if it had had frequent and recent application of silicon to the side of the step."

Second, regarding size of the gap, the industry standard sets a maximum gap of 3/16 of an inch on either side of the escalator steps. Despite this standard, leading manufacturers design their escalators for a smaller gap. Westinghouse, the maker of the escalator at issue, recommends a gap size of 1/16 or 1/8 of an inch in its manual. Schindler's former president also recognized that the more the gap is narrowed, the chance of injury is reduced. Soon after Scooter's accident, two experts measured the gap. Schindler's expert found an average of 1/16 of an inch gap on one side and 1/8 of an inch on the other side of the escalator steps. An Anderson expert found 3/16 of an inch gaps on one side and as large as 1/4 of an inch on the other side, a clearly excessive amount. Testimony showed that the size of the gap on both sides was important because the steps can shift laterally, especially if pressure is applied. In the opinion of the Anderson's expert, the escalator in question could have been adjusted to a gap of even less than 1/8 of an inch. Further, he testified that Scooter's foot got caught because the gap was excessive.

Third, regarding failure to recommend upgrades, the evidence showed that in 1995, the building owner had excess funds to dedicate for upgrades on the escalators. Schindler recommended nothing for safety, but instead spent the money to make the escalators quieter. At this time, there were many safety upgrades available: painting stripes along the step edges and footprints in the step centers; using raised cleats along the edges to make it uncom-

fortable to place feet there; changing the colors and graphics of warning signs; installing self-lubricating skirts; and installing safety side-plates or similar devices to narrow the gap between the skirt. The evidence shows that these precautions were practically feasible and would reduce or "virtually eliminate" the risk of entrapment.

 The crux of Schindler's argument is that the accident could have occurred regardless of recent lubrication, minimal gap, and upgrades such as side-step safety plates. However, absolute certainty is not required. *Purina Mills*, 948 S.W.2d at 936. "Nor must the plaintiff exclude every other possibility." *Id.* Further, there may be more than one proximate cause. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). The evidence, portions of which we have discussed, is both legally and factually sufficient to show that Schindler's negligence was the cause-in-fact of Scooter's injuries. We thus overrule issue one.

## APPORTIONMENT OF LIABILITY

 In its second issue, Schindler contends that because Scott Anderson was the only person who could have prevented the accident entirely, the evidence is legally and factually insufficient to support the jury's apportionment of 90% of the fault to Schindler.[6] Schindler argues this issue in one sentence at the end of its proximate cause briefing and fails to provide any case law regarding evidentiary sufficiency in the context of apportionment of fault. Bare assertions of error, without citations to authority, waive error. TEX.R.APP.P. 38.1(h); *Thedford v. Union Oil Co. of Ca.*, 3 S.W.3d 609, 616 (Tex.App.—Dallas 1999, pet. denied); *see also Fredonia State Bank v. General Am. Life Ins. Co.*, 881

S.W.2d 279, 284 (Tex.1994) (appellate court has discretion to waive points of error due to inadequate briefing). We conclude that Schindler has waived its second issue.

## DAMAGES

In issue twelve, Schindler contends there is legally and factually insufficient evidence of the existence of Scooter's future mental anguish and Mr. Anderson's loss of consortium. In issue thirteen, Schindler argues that there is legally and factually insufficient evidence to support the total dollar amount of damages awarded by the jury. On cross-point, the Andersons contend that the trial court erred in remitting the jury's award for past and future medical expenses, Scooter's future pain and mental anguish, and Mr. Anderson's past loss of consortium. These points necessitate a review of each element of damages.

### A. Standard of Review

 We have already set forth the standards of review for legal and factual sufficiency. Additionally, we review remittitur under a factual sufficiency standard. *Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex.1987). In other words, we may uphold a trial court's remittitur only when the evidence is factually insufficient to support the jury's verdict. *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 665 (Tex.App.—Fort Worth 1999, pet. denied). In conducting this review, we must consider and weigh all of the evidence and should set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176.

---

6. Westinghouse, whom Schindler acquired, argued a similar issue in 1965: "[mother's] conduct was sole proximate cause of the accident." *Gillam*, 341 F.2d at 460.

## B. Elements of Damages

### 1. Future medical

First, Schindler challenges the jury's award of $700,000 for future medical care. The crux of Schindler's argument is that testimony about Scooter's future medical care was based on surmise. After verdict, the trial court remitted the award for future medical to $330,043.50, and the Andersons contend such a remittitur was error.

Most of the evidence about Scooter's future medical care was provided by Dr. Donald Baxter, an orthopedic surgeon who specializes in the hands and feet. At trial, Dr. Baxter, described the traumatic degloving of the skin and toes from Scooter's foot and the problems associated with such an injury. In his opinion, the chances for future surgeries is 100%. For instance, the bones in Scooter's foot will continue to grow, perhaps through the skin where his toes were amputated. Scooter will need surgery to remove this bony overgrowth. Additionally, Scooter is "most likely" to experience future infections, either minor or severe. Because his was an open wound, he is also at an increased risk for osteomyelitis. Scooter will always have to guard against friction ulcerations of the skin grafts on the ball of his foot. In Dr. Baxter's opinion, it is "likely" that Scooter will experience skin graft breakdown. If these problems develop, additional surgeries will be necessary to remove pus and diseased bone and to correct skin grafts.

Further, Dr. Baxter testified that Scooter's gait will be changed such that extra stresses will be placed on his pelvis and back; some people with an injury such as Scooter's eventually require back surgery. Scooter will require special shoes or inserts to try to prevent these back problems, and each insert costs three to four hundred dollars. Lastly, Dr. Baxter testified that amputation of Scooter's two remaining, clawed toes will probably be "ultimately necessary." When clawing occurs, because of loss of musculature on the foot, the toes "usually" rub to the point where "they have to be removed."

Dr. Rosemary Buckle, an orthopedic surgeon, also testified. In her opinion, Scooter has a "lifetime need" for a prosthetic device for his foot. Further, she believes that Scooter has an increased risk of skin graft breakdown, which would need further surgery to repair. Additionally, the donor site on Scooter's back from where skin was taken for grafts has developed a thick, raised, prominent keloid scar. The extent of plastic surgery needed to repair the scar cannot be determined until Scooter is fully grown. Finally, according to Dr. Buckle, Scooter "may or may not" experience bony overgrowth, osteomyelitis, and skin graft breakdown.

Dr. Baxter's assessment of the costs for Scooter's future medical care is a "best case scenario" of $400,000 to easily $1,000,000. Although Schindler claims these amounts are excessive, it points to no counterproof. At trial, it did not cross-examine the witnesses about costs of specific procedures. It did not offer any witnesses on its own behalf about the costs of future medical care. Its position at trial was instead that Scooter was functioning normally and had no need of future medical intervention. In review of all the evidence, we find that there was factually sufficient evidence of Scooter's future medical care and costs. Further, the total amount awarded by the jury, $700,000, is well within the range to which Dr. Baxter testified. The amount to which the trial court remitted the award, $330,043.50, is below the minimum costs established by the evidence. Because the evidence is factually sufficient, the trial court erred in remitting this element of damages. Ac-

cordingly, we overrule Schindler's issue thirteen and sustain the Andersons' cross-point as to future medical.

## 2. Future pain and mental anguish

 In its twelfth issue, Schindler attacks only the existence of Scooter's future mental anguish; it does not attack the existence of future physical pain. In cases in which the jury awarded damages in broad form for mental anguish and pain, an appellant waives error on appeal if he attacks only the mental anguish, and not also the evidence of pain. *See Wal–Mart Stores, Inc. v. Garcia,* 30 S.W.3d 19, 24 (Tex.App.—San Antonio 2000, no pet.); *Brookshire Bros., Inc. v. Lewis,* 997 S.W.2d 908, 921–22 (Tex.App.—Beaumont 1999, pet. denied). Because Schindler's issue twelve fails to address the legal and factual sufficiency of the evidence of Scooter's future pain, which was submitted in broad form with future mental anguish, it has waived error for appeal.

Nonetheless, we address the factual sufficiency of Scooter's future mental anguish and pain because of issue thirteen and the Andersons' cross-point, in which they contend the trial court erroneously remitted the jury's award from $1,000,000 to $308,393.57.

 The term "mental anguish" implies a relatively high degree of mental pain and distress. "It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995).

Further, "[w]here serious bodily injury is inflicted, ... we know that some degree of physical and mental suffering is the necessary result." *City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex.1997).

Although the evidence shows that Scooter is a happy child who, at the time of trial, was active in many sports, other evidence showed that his future will not be problem free. His child psychologist testified that Scooter is continually concerned about the loss of his foot, avoids looking at it, and wears a sock at all possible times, including when swimming. He has asked his parents numerous times if his toes will grow back. In the psychologist's opinion, Scooter will continue to psychologically adjust to the loss of his toes and injury to his foot in the future. An occupational therapist, who works with amputees, testified for the defense that although amputees are normally uncomfortable looking at and touching their limbs, this discomfort usually disappears over time.

Further, Scooter experiences exaggerated fears for the safety of his family because of his accident. For example, he once greatly panicked when his mother tried to go up an escalator with his baby sister. According to the psychologist, these fears will continue to varying degrees in the future. During transition periods of his life, such as puberty, developmental problems because of his foot will continually arise. Scooter's image of himself and his self-confidence will be affected by his foot, his problems with it, and others' reactions to it. His self-esteem is based in large part on his physical ability, and when he cannot compete athletically on the level of his peers in the future, it will be very difficult for him.[7] However,

7. Dr. Baxter testified that because Scooter lost considerable muscle and nerves from the degloved foot, and because of the loss of the toes, it will be more difficult for him to push off the ball of his foot. According to the surgeon, by high-school age, the only sport in

according to the occupational therapist's review of Scooter's records, she did not foresee future physical limitations for him.

Further, the evidence shows that Scooter will experience additional pain in the future. The two orthopedic surgeons testified that because of the traumatic degloving of the skin and toes from Scooter's foot, he will be more prone to infection, osteomyelitis, and skin graft breakdown. Scooter's future medical care includes further surgeries, including removal of bony overgrowth and amputation of his remaining toes. Testimony by one of the surgeons and by the psychologist show that these additional surgeries will entail fear, worry, emotional problems, and pain.[8]

After review of the entire record, we hold that there is factually sufficient evidence of future pain and mental anguish. As part of this review, we have also determined whether some evidence exists to justify the amount awarded by the jury as fair and reasonable. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). Given Scooter's future medical care and surgeries, including their costs, we cannot say that the jury's award of $1,000,000 for his future pain and mental anguish is unreasonable. Certainly, the amount is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we sustain the Andersons' cross-point that the trial court erred in remitting the award from $1,000,000 to $308,393.57. We overrule Schindler's issue thirteen as to future pain and mental anguish.

### 3. Physical Impairment

The jury awarded $1,000,000 for past physical impairment and $5,000,000 for future physical impairment. The trial

court remitted these amounts to $304,878.28 and $1,524,390.80, and the Andersons do not appeal the remittitur. Thus, we only address the sufficiency of the evidence for Schindler's issue thirteen.

Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle. *Wal–Mart Stores, Inc. v. Holland*, 956 S.W.2d 590, 599 (Tex.App.—Tyler 1997), *rev'd on other grounds*, 1 S.W.3d 91 (per curiam). To receive damages for physical impairment, the injured party must prove that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated. *Peter v. Ogden Ground Serv., Inc.*, 915 S.W.2d 648, 650 (Tex.App.—Houston [14th Dist.] 1996, no writ).

Schindler argues that Scooter is functioning normally for a child his age, with no present physical limitations. The evidence shows that Scooter plays various sports, runs, and has "satisfactory motor skills" according to his elementary teacher. In fact, Scooter testified, "I can do all the things I used to do." An occupational therapist testified that from her review of the records in the case, she foresaw no physical limitations for Scooter. Schindler thus argues that in light of Scooter's present functioning, future limitations are nothing but speculation.

Schindler's argument about Scooter's current condition ignores the weeks of convalescence that he endured where he could not walk, was carried by his parents, and had to use a bedpan. At one point, he

---

which Scooter will be able to participate at a competitive level is swimming.

**8.** Scooter required six weeks of morphine after his first five surgeries.

could only move about his house in a wheelchair or by scooting along with his bad foot held in the air. Additionally, he required physical therapy to learn to walk on his foot. There is both legally and factually sufficient evidence of past physical impairment.

As to future physical impairment, Dr. Buckle testified that Scooter has a "permanent impairment." Because his injury ripped out his big toe, his ability to bear weight is altered, and running will be more difficult. Dr. Baxter testified that even Scooter's walking will be affected and that Scooter limps when he is tired. The evidence also showed that throughout his life, Scooter will have to guard against any movement that causes friction, which would damage the skin graft on the ball of his foot. He will have problems with standing for long periods and with climbing. When he has his remaining two, clawed toes removed, only shortened steps will enable him to walk without an "appreciable limp." Although Schindler claims that future impairment is speculative, at no instance throughout this evidence did Schindler object that the testimony was speculative. We find that there is also legally and factually sufficient evidence of future impairment. We overrule issue thirteen to this extent.

### 4. Disfigurement

■ The next element of damages that Schindler challenges is disfigurement, for which the jury awarded $3,000,000 for past and $3,000,000 for future disfigurement. The trial court remitted each of these amounts to $914,663.91, and the Andersons have not appealed the reduction.

■ Disfigurement is "that which impairs or injures the beauty, symmetry, or appearance of a person ...; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Goldman v.*

*Torres,* 161 Tex. 437, 341 S.W.2d 154, 160 (1960). There is legally sufficient evidence of Scooter's disfigurement. Further, in review of all the evidence, there is factually sufficient evidence. The jury viewed photographs of Scooter's foot, with its missing and misshapen toes and damaged bottom. The jury also viewed Scooter's foot in the courtroom. According to all witnesses, the injury was severe. The testimony and documents at trial showed that Scooter refused to look at his foot, even during bathing. He wears a sock at all times, even when swimming. He has told his mother his foot is "stinky and I hate it." The defense's occupational therapist even agreed that amputees are normally uncomfortable looking at and touching their stump, and grow out of this discomfort over time. Although he has shown his foot to his class, Scooter has also asked playmates to leave when his sock is changed. Further, there was evidence that in the future, Scooter will experience bone overgrowth and probable loss of his remaining clawed toes, causing further deformity. Lastly, he has a thick, prominent keloid scar from where skin was taken to graft.

### 5. Past medical

■ In their cross-point, the Andersons claim that the trial court's remittitur of past medical damages was error. The jury awarded the Andersons $70,000 for past medical expenses, but the trial court remitted this amount to $48,226.75. The evidence at trial shows that Scooter had endured five surgeries on his foot, physical therapy, two months of a wheelchair, a walking cast, two prosthetic swim socks, and counseling. Testimony at trial shows that at the time of Dr. Baxter's deposition, Scooter's past medical bills were $68,691.69. Medical billing submitted in evidence at trial totaled just over

$72,000 for Scooter's care. Because the evidence is factually sufficient to support the jury's award of $70,000 in past medical, the trial court erred in remitting the award to $48,226.75. Accordingly, we sustain the Anderson's cross-point as to this element of damages.

### 6. Mr. Anderson's Loss of Consortium

In issue twelve, Schindler contends that there is legally and factually insufficient evidence of Mr. Anderson's past loss of consortium. By cross-point, the Andersons contend that the trial court erred in remitting the jury's award of $100,000 for past loss of consortium.

Loss of consortium, or companionship, is a significant injury to the familial relationship worthy of compensation. *Sanchez v. Schindler,* 651 S.W.2d 249, 252 (Tex.1983). Consortium comprises the positive benefits flowing from the love, comfort, companionship, care, and society that a claimant would have received had the negligence not occurred. *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990); *Enochs v. Brown,* 872 S.W.2d 312, 321 (Tex.App.—Austin 1994, no writ); *see Moore v. Lillebo,* 722 S.W.2d 683, 688 (Tex. 1986). The supreme court has recognized that "these terms concern subjective states which present some difficulty in translating the loss into a dollar amount." *Whittlesey v. Miller,* 572 S.W.2d 665, 667 (Tex. 1978). However, some of the factors that the jury may consider in determining the amount of damages include the severity of the injury and its actual effect on the parent-child relationship, the child's age, the nature of the child's relationship with the parent, and the child's emotional and physical characteristics. *See Reagan,* 804 S.W.2d at 476 (discussing child's loss of parental consortium).

We find that there is legally sufficient evidence of Mr. Anderson's loss of consortium. The evidence shows that he was deprived of his son's usual company in the weeks Scooter was hospitalized, the time he spent in a wheelchair, and when he received his walking cast. During the time that Scooter could not walk, he was much like an infant who had to be carried, fed, and given a bedpan. Further, his child psychologist testified that because of this incident, Scooter prematurely sees Mr. Anderson as imperfect. Such change in perception of a parent usually does not occur until teenage years. Scooter has expressed anger and blame at his father for the incident. Lastly, Mrs. Anderson testified that Scooter has doubts about his father because Mr. Anderson was the one with him on the escalator. This has been a source of problems that "kills Scott ... it hurts him terribly." According to her testimony, the incident had been traumatic to the family. She testified that they were still trying to put the family unit back together and that they struggle everyday. Taken in the light most favorable to the verdict, this is legally sufficient evidence to support Mr. Anderson's claim of loss of consortium.

In reviewing all the evidence for factual sufficiency, the record also reveals that at the time of trial, Scooter played on a dad's pitch baseball team for which his father is the coach, and he hunts, fishes, and golfs with his father. Additionally, the Andersons cite evidence that Mr. Anderson had to tell Scooter that his toes were not growing back, that Mr. Anderson consulted with a child psychologist, that seeing his son's injury occur effected Mr. Anderson greatly, and that mental anguish flows through him every day. However, these are examples of Mr. Anderson's mental anguish, for which he was separately awarded $70,175.43. Given all the record, we find that the evidence of Mr. Anderson's loss of consortium is not so

weak or the evidence to the contrary so overwhelming as to make the jury's finding of such damages to be manifestly unjust, shocking to the conscience, or a clear demonstration of bias. In short, the evidence of the existence of Mr. Anderson's past loss of consortium is factually sufficient.

### 7. Excessive Damages

We have concluded that factually and legally sufficient evidence exists for all elements of damages discussed above. Much of Schindler's argument, however, focuses on whether the evidence is legally and factually sufficient to support the *dollar amount* of damages awarded as opposed to the mere *existence* of those damages. Schindler contends that the amount awarded must be fair and reasonable. It insists that the aggregate jury finding of $16,970,000 for "the loss of three toes" is "clearly not supportable." [9] It seeks either a new trial or further remittitur to a total award of less than $660,000.

The supreme court has held that a jury award should be an amount that would "fairly and reasonably compensate for [a] loss." *Saenz*, 925 S.W.2d at 614 (addressing mental anguish valuation); *Russell v. Ramirez*, 949 S.W.2d 480, 487 (Tex.App.—Houston [14th Dist.] 1997, no writ) (addressing fair and reasonable compensation for mental anguish, loss of companionship, and past and future damages for son's death). The "measure of damages in a personal injury case is not subject to precise mathematical calculation." *Weidner v. Sanchez*, 14 S.W.3d 353, 372 (Tex.App.—Houston [14th Dist.] 2000, no pet.). Thus, the jury has wide discretion in resolving matters of pain and suffering, disfigurement, impairment and setting the

amounts attributable thereto. *Id.; J. Wigglesworth Co.*, 985 S.W.2d at 665; *Brookshire Bros., Inc. v. Wagnon*, 979 S.W.2d 343, 354 (Tex.App.—Tyler 1998, pet. denied); *Duron v. Merritt*, 846 S.W.2d 23, 26 (Tex.App.—Corpus Christi 1992, no writ). Despite this broad discretion, there must "be some evidence to justify the amount awarded," as a jury "cannot simply pick a number and put it in the blank." *Saenz*, 925 S.W.2d at 614.

In this case, as detailed above, we are convinced that the evidence supports the existence of each element of damages. From a thorough review of the evidence, we also find that there is evidence to justify the amounts awarded. Scooter suffered a severe, traumatic injury when the escalator ripped his toes and the skin, muscles, and nerves from the bottom of his foot. The pain, anguish, and disfigurement he has suffered and will suffer is substantial. As he ages, his injury will impair him from reaching the full, physical potential he once had. His relationship with his father has been detrimentally effected. Our examination of the jury's verdict shows that it measured carefully each element of damages. It awarded zero dollars for Scooter's loss of earning capacity, Mr. Anderson's future loss of consortium, Mr. Anderson's future mental anguish, and Mrs. Anderson's past and future loss of consortium. For future medical, it awarded less than the maximum amount to which Scooter's orthopedic surgeon testified. Clearly, the jury did not just pick numbers from the air. As factually sufficient "evidence exists to support the jury's verdict, this court will not substitute its judgment for that of the jury." *Weidner*, 14 S.W.3d at 372. We overrule issue thir-

---

**9.** Schindler argues about the $16.97 million jury award, not the amount ultimately awarded by the trial court. However, the Andersons are not appealing some $10 million that the trial court remitted.

teen's challenge to the amount of damages awarded.

In summation, we have overruled issue twelve in part and found that Schindler did not preserve error in part. We have also overruled issue thirteen. We have sustained the Andersons' cross-point.

## STRICT LIABILITY

Schindler's remaining issues, numbers three through eight, address strict liability. Even if we addressed these issues and found error, the Andersons' could still recover because the jury found in their favor on the negligence issues. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995) (where jury returns verdict on two or more alternative theories, prevailing party may recover under alternative theory if judgment on one theory is reversed on appeal). "In cases where the judgment rests on multiple theories of recovery, an appellate court need not address all causes of action if any one theory is valid." *Checker Bag Co. v. Washington,* 27 S.W.3d 625, 634 (Tex.App.—Waco 2000, pet. denied); *George Grubbs Enter., Inc. v. Bien,* 881 S.W.2d 843, 851 n. 7 (Tex.App.—Fort Worth 1994), *rev'd on other grounds,* 900 S.W.2d 337 (Tex.1995). Because we have overruled challenges to the negligence portion of the verdict, we need not address the strict liability issues.

## CONCLUSION

In conclusion, the trial court did not err in admitting the portion of the muted Dateline videotape. Neither did the trial court err in finding the Andersons' expert, Carl White, qualified to testify. Schindler did not preserve error to complain on appeal about the reliability of Carl White's testimony. The Anderson's "send a message" jury argument was not improper, based on the evidence, and required an objection to preserve any error for appeal.

Their argument about other types of product liability litigation was error, but was curable with a proper objection and did not cause reversible harm because the jury's verdict was clearly grounded on the proper proceedings. There was sufficient evidence of proximate cause. Schindler waived its issue about apportionment of liability. There was sufficient evidence to support the existence of each element of damages as well as the amount of damages awarded. Finally, strict product liability issues are moot given our disposition on negligence issues.

Because there was factually sufficient evidence of Scooter's past and future medical costs, Scooter's future pain and mental anguish, and Scott Anderson's past loss of consortium, the trial court erred in remitting the jury's awards for these damages. We reverse the remittitur as to these four amounts. We remand for calculation of the damages in accordance with this opinion.

We affirm the remainder of the trial court's judgment.

En Banc court consists of Chief Justice BRISTER, Justices YATES, ANDERSON, HUDSON, FOWLER, EDELMAN, FROST, SEYMORE and GUZMAN and Senior Justices DRAUGHN, SEARS and LEE.

SCOTT BRISTER, Chief Justice, dissenting on denial of rehearing en banc.

Given the importance of the issues discussed below, I believe this case should be decided by the Court en banc rather than a panel of three visiting judges. Because a majority of the Court votes to deny the motion for rehearing en banc, I respectfully dissent.

### The Punitive Problem

Punitive damages are warranted only when clear and convincing evidence shows

malice or fraud.[1] The trial court ruled there was no such evidence in this case, and the plaintiffs do not appeal that ruling. Nonetheless, in all probability the panel's judgment includes them.

What happened in this case is quite clear—the jury included punitive damages in the guise of compensatory damages. Three facts make this plain:

1. *The plaintiffs' counsel told them to do it.* On Schindler's motion, trial was bifurcated.[2] The jury's first verdict should have included only compensatory damages.[3] Compensatory damages are intended to make a plaintiff whole; punitive damages are intended to deter others, an "altogether different purpose."[4] But during his closing rebuttal (when Schindler's attorney could no longer respond), the Andersons' attorney urged the jury to award damages that would not just compensate his clients, but would "send a message" to the entire escalator industry:

> I'm convinced with your verdict when you reach the truth that you'll send a message loud and indubitably clear to the escalator industry they can't carry this charade on any more; it's been uncovered and they're going to make those escalators reasonably safe.

> \* \* \* \* \* \*

> Ladies and gentlemen, you are the jury. You are the conscience of this community, and as such, we beg you to send a declaration to the escalator industry. When you walk through that door of that jury room you will have an opportunity on behalf of all parents, all children everywhere, to talk directly to the board of directors of all the escalator companies in the world because, believe me, they're watching this trial. It is very unlikely that you will have the opportunity to serve mankind as much as you will have in this case, to do so much good for children. If your verdict is large enough they'll listen to it and they'll make changes.

> \* \* \* \* \* \*

> I beg you to write justly, be proud, and when you go home, all of you, this week or whenever it is, and your family asks you, what did you do in Court, you can look them in the eye and say, here's what I did in Court. I made this community and this world a safer place to live in because I helped make it safer for the little people.

2. *The jurors said they did it.* Schindler attached to its motion for new trial two newspaper articles that referenced the following post-trial comments by jurors:

> "None of us had an idea there would be a punitive side. We thought what we were doing [in the first verdict] was sending a message to the industry," said juror Kevin Fletcher of Houston.[5]

Jurors said after the 10–2 verdict they did not realize there would be a punitive damages phase and awarded the $17 million on May 21 to send Schindler a message. The next day, they awarded only $100,000 in punitive damages.[6]

3. *The verdict shows they did it.* The jury returned a verdict of $16.97 million as compensatory damages, but only $100,000 as punitive damages. From beginning to

---

1. *See* TEX. CIV. PRAC. & REM.CODE § 41.003.

2. *See id.* § 41.009.

3. *Id.* § 41.009(c)(2).

4. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 16 (Tex.1994).

5. Ron Nissimov, *Punitive damages set for escalator accident,* HOUSTON CHRONICLE, May 23, 1998, at 37A.

6. Ron Nissimov, *Judge reduces award in child-injury case,* HOUSTON CHRONICLE, August 11, 1998, at 15A.

end, the Andersons' case focused on showing negligence in an entire industry. Indeed, they had little choice—the safety side plates designed by their only liability expert to avoid accidents like this one had been rejected by not just Schindler but by all its competitors. Moreover, the appellees make no effort by cross-appeal to reinstate more than 60% of the "compensatory" damages awarded by the jury. Unless the jury confused compensatory and punitive damages, this verdict makes little sense.

### Revising the Standard of Review

The standard for reviewing a trial court's order of remittitur changed fifteen years ago. In 1987, Justice Kilgarlin writing for a majority of the Texas Supreme Court held in *Larson v. Cactus Utility Co.* that courts of appeals should thenceforth apply a factual-sufficiency standard of review.[7] An abuse-of-discretion review had been the previous standard, under "long-established precedent" and several unanimous Supreme Court opinions, as pointed out by Chief Justice John Hill (joined by Justice Raul Gonzalez) in dissent.[8]

This change put Texas out-of-step with most other states. At least thirty-nine of our sister states review a trial court's order of remittitur for abuse of discretion.[9] Only a handful of states apply a different standard, usually due to a special statute

---

7. 730 S.W.2d 640, 641 (Tex.1987).

8. *Id.* at 642 (Hill, C.J., dissenting); *see Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835, 840 (1959); *Wilson v. Freeman*, 108 Tex. 121, 125, 185 S.W. 993, 994 (1916).

9. *See Rainsville Bank v. Willingham*, 485 So.2d 319, 325 (Ala.1986); *International Bhd. of Elec. Workers, Local 1547 v. Alaska Util. Const., Inc.*, 976 P.2d 852, 857 (Alaska 1999); *Duncan v. State*, 157 Ariz. 56, 754 P.2d 1160, 1166 (Ariz.Ct.App.1988); *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980, 994 (Cal.1978); *Walford v. Blinder, Robinson & Co., Inc.*, 793 P.2d 620, 627 (Colo.Ct.App.1990); *Alfano v. Ins. Center of Torrington*, 203 Conn. 607, 525 A.2d 1338, 1342 (Conn.1987); *Moffitt v. Carroll*, 640 A.2d 169, 176 n. 2 (Del.1994); *S & S Toyota, Inc. v. Kirby*, 649 So.2d 916, 920 (Fla.Dist.Ct.App. 1995); *Lisle v. Willis*, 265 Ga. 861, 463 S.E.2d 108, 110 (Ga.1995); *Toews v. Funk*, 129 Idaho 316, 924 P.2d 217, 222 (Idaho Ct.App.1994); *NC Illinois Trust Co. v. First Illini Bancorp, Inc.*, 323 Ill.App.3d 254, 256 Ill.Dec. 925, 752 N.E.2d 1167, 1178–79 (Ill. App.Ct.2001); *Russell v. Neumann–Steadman*, 759 N.E.2d 234, 236 (Ind.Ct.App.2001); *Lamb v. Newton–Livingston, Inc.*, 551 N.W.2d 333, 336 (Iowa Ct.App.1996); *York v. InTrust Bank, N.A.*, 265 Kan. 271, 962 P.2d 405, 431 (Kan.1998); *C.N. Brown Co. v. Gillen*, 569 A.2d 1206, 1209 (Me.1990); *Franklin v. Gupta*, 81 Md.App. 345, 567 A.2d 524, 533 (Md. Ct.Spec.App.1990); *D'Annolfo v. Stoneham Housing Authority*, 375 Mass. 650, 378 N.E.2d 971, 979 (Mass.1978); *Palenkas v. Beaumont Hospital*, 432 Mich. 527, 443 N.W.2d 354, 354 (Mich.1989); *Lundman v. McKown*, 530 N.W.2d 807, 832 (Minn.Ct.App.1995); *Alpha Gulf Coast, Inc.v. Jackson*, 801 So.2d 709, 726 (Miss.2001); *Moore v. Missouri–Nebraska Express, Inc.*, 892 S.W.2d 696, 713 (Mo.Ct.App. 1994); *Cartwright v. Equitable Life Assurance Society of the United States*, 276 Mont. 1, 914 P.2d 976, 998 (Mont.1996); *Barbour v. Jenson Commercial Distributing Co.*, 212 Neb. 512, 323 N.W.2d 824, 827 (Neb.1982); *Canterino v. The Mirage Casino–Hotel*, 16 P.3d 415, 417 (Nev.2001); *Daigle v. City of Portsmouth*, 129 N.H. 561, 534 A.2d 689, 704 (N.H.1987); *D'ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J.Super. 11, 501 A.2d 990, 995 (N.J. Super Ct.App. Div.App.1985); *Welken v. Conley*, 252 N.W.2d 311, 318–19 (N.D.1977); *Betz v. Timken Mercy Medical Center*, 96 Ohio App.3d 211, 644 N.E.2d 1058, 1063 (Ohio Ct.App. 1994); *Strubhart v. Perry Memorial Hosp. Trust Authority*, 903 P.2d 263, 270–71 (Okla. 1995); *Oliver v. Burlington Northern, Inc.*, 271 Or. 214, 531 P.2d 272, 274 (Or.1975); *Haines v. Raven Arms*, 539 Pa. 401, 652 A.2d 1280, 1282 (Pa.1995); *Rush v. Blanchard*, 310 S.C. 375, 426 S.E.2d 802, 806 (S.C.1993); *Wangen v. Knudson*, 428 N.W.2d 242, 244–45 (S.D.1988); *Stevenett v. Wal–Mart Stores, Inc.*, 977 P.2d 508, 517 (Utah Ct.App.1999); *Brault v. Flynn*, 166 Vt. 585, 690 A.2d 1365, 1366 (Vt.1996); *Shepard v. Capitol Foundry of Va., Inc.*, 262 Va. 715, 554 S.E.2d 72, 75 (Va.

or rule.[10] Federal appellate courts likewise follow the abuse-of-discretion standard of review.[11]

Factual-sufficiency review is appropriate when *appellate courts* grant remittitur.[12] As appellate judges, we know nothing about a trial except what appears in the written record. We cannot grant a new trial—remittitur's conjoined twin—for reasons that do not appear in the record.[13]

But *trial courts* can—they enjoy much broader discretion in granting a new trial.[14] They are also uniquely positioned to determine whether the jury's award was based on passion or prejudice rather than reason.[15] Trial judges may grant new trials:

- because of their own erroneous rulings, or because a member of the jury was inattentive; [16]

- because improper factors—such as bias, racism, or corruption—may have influenced the jury's award; [17]

- for no stated reason,[18] or even if a stated reason is wrong.[19]

Undoubtedly, the trial judge here could have granted a new trial because the jurors made a glaring mistake in answering the questions put to them. Because it would have been wasteful for all concerned to try this case twice, the trial judge properly gave the plaintiffs a choice between a new trial and a remittitur. As in every

---

2001); *Miller v. Triplett*, 203 W.Va. 351, 507 S.E.2d 714, 719–20 (W.Va.1998); *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 557 N.W.2d 67, 81 (Wis.1996); *Texas West Oil & Gas Corp. v. Fitzgerald*, 726 P.2d 1056, 1064 (Wyo.1986).

**10.** *See Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285, 290 (Ark.1996) (applying de novo review to determine whether amount shocks conscience of appellate court); *Foster v. Cohen*, 742 So.2d 47, 49 (La.App.1999) (noting that under La.Code Civ. P. Art 2083(B), appellate court reviews jury's award rather than trial court's remittitur for abuse of discretion); *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 127 N.M. 1, 976 P.2d 1, 9 (N.M.1999) (holding that appellate court reviews trial court's specific findings for remittitur under a passion or prejudice standard); N.Y. C.P.L.R. 5501(c) (Consol. 2001) (requiring that remittitur be reviewed to determine whether award deviates materially from what would be reasonable compensation); *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn.Ct.App.1990) (applying three-step process for review of adjustment of damages verdict: reason for adjustment, amount of adjustment, and whether evidence preponderates against the adjustment); *Hayhurst v. LaFlamme*, 441 A.2d 544, 547 (R.I.1982) (giving great weight to trial court's ruling on adequacy of jury's award when trial court has reviewed an additur motion from the prospective of a seventh juror); *Thompson v. Berta*

*Enters., Inc.*, 72 Wash.App. 531, 864 P.2d 983, 989 (Wash.Ct.App.1994) (de novo review).

**11.** *Browning–Ferris Indus. of Vermont v. Kelco Disposal, Inc.*, 492 U.S. 257, 278–79, 109 S.Ct. 2909, 2921–22, 106 L.Ed.2d 219 (1989).

**12.** *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).

**13.** *Guajardo v. Conwell*, 46 S.W.3d 862, 864 (Tex.2001); *Melendez v. Exxon Corp.*, 998 S.W.2d 266, 274 (Tex.App.—Houston [14th Dist.] 1999, no pet.).

**14.** TEX.R. CIV. P. 320; *see Champion Intern. Corp. v. Twelfth Court of Appeals*, 762 S.W.2d 898, 899 (Tex.1988).

**15.** *Moriel*, 879 S.W.2d at 28.

**16.** *See In re Bayerische Motoren Werke, AG*, 8 S.W.3d 326, 327 (Tex.2000) (Hecht, J., dissenting from denial of motion for rehearing of denial of petition for mandamus).

**17.** *Larson*, 730 S.W.2d at 642 (Hill, C.J., dissenting).

**18.** *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex.1985).

**19.** *Kolfeldt v. Thoma*, 822 S.W.2d 366, 368 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding).

case reviewing remittitur on appeal, they indicated a preference for the latter.

When remittitur is based on weak evidence, it is reasonable to review it for factual sufficiency.[20] But if a remittitur is based on bias, corruption, unfairness, or any other reason *outside* the trial record, testing the evidence *within* the trial record for factual sufficiency is nonsense—the taint lies elsewhere.[21] Under the *Larson* rule, remittitur is not an option in such cases; if the problem lies outside the trial record, the remittitur will always be reversed on appeal. Trial judges facing this problem can only grant a new trial to undo the harm—even if the plaintiff would prefer remittitur.

### The Panel's Predicament

The panel in this case upholds $3.5 million of the judgment—and adds more than $1 million to it—even though both probably include punitive damages. By faithfully applying a factual-sufficiency standard of review, the panel must turn a blind eye to what happened in this trial and after it:

1. *Ignore what the plaintiffs' counsel said.* The argument by the Andersons' attorney invited error, but Schindler's counsel did not object. Schindler makes a plausible argument that it was trapped— an objection would have played into the plaintiffs' theory of an industry-wide conspiracy of silence that Schindler was trying to protect. But this Court has already

held that "send a message" arguments are not incurable,[22] so an objection was required.

2. *Ignore what the jurors said.* A juror cannot testify or submit an affidavit about any matter occurring during deliberations.[23] Thus, jurors may tell the newspapers about their mistakes, but not us.

3. *Ignore the glaring disparity in the verdict.* The panel concludes that because factually sufficient evidence supports each element of damages, it also supports the entire verdict. Under *Larson*, there is little more that can be done. We *must* compare compensatory and punitive damages awards when we review the second; it is hard to see why we shouldn't do the same when we review the first.[24]

### Measuring the Unmeasurable

A further problem with *Larson* is that when intangible damages are involved (as they are here), we lack the tools to conduct a meaningful review. Considering all the evidence in this case (as factual-sufficiency review requires),[25] we find that:

- on the one hand, Scooter Anderson is a happy child, has had a remarkable recovery, is currently active in many sports, is doing well at one of Houston's premiere private schools, and appears to have a bright future;
- on the other hand, he has undergone a harrowing injury, is still adjusting to

---

**20.** Factual sufficiency may again be appropriate when one judge hears the trial and a different judge orders the remittitur. *See Marathon Oil Co. v. Sterner*, 777 S.W.2d 128, 133 (Tex.App.—Houston [14th Dist.] 1989, no writ).

**21.** Of course, in order to know which the trial judge did, there must be a statement of the reason. *See Bayerische Motoren*, 8 S.W.3d at 327 (Hecht, J., dissenting) (arguing that trial judges should state reason for granting a new trial).

**22.** *See Gannett Outdoor Co. of Texas v. Kubeczka*, 710 S.W.2d 79, 87 (Tex.App.—Houston [14th Dist.]1986, no writ).

**23.** Tex.R. Civ. P. 327; Tex.R. Evid. 606(b).

**24.** *Moriel*, 879 S.W.2d at 29.

**25.** *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001).

the loss of a large part of his foot, occasionally has exaggerated fears for his safety and that of his family, and may have to undergo many more surgeries in the future.

Obviously, there was factually sufficient evidence that Scooter suffered pain, mental anguish, impairment, and disfigurement. But was there factually sufficient evidence that Scooter's future pain and mental anguish amounted to $1,000,000.00 rather than $304,878.28? Or that his future physical impairment amounted to $1,524,390.80 rather than some lower figure? That, of course, is difficult to say.

Two highly-respected academics have commented on this problem with *Larson:*

In cases involving intangible damages, it will be difficult for appellate courts to point to specific testimony that demonstrates excessiveness (or inadequacy, for that matter). Nevertheless, common sense suggests that courts should have some authority to review excessive or inadequate damage awards. It would be unwise to permit a jury to make any award it thinks fit without limit, even though it is dealing with damages that resist exact calculation or quantifica-

tion.... Without some kind of review, the system will produce radically inconsistent awards for the same kinds of injuries and will be destined to take on more of the aspects of a lottery than it already has.[26]

Shortly after *Larson,* one of our sister courts took the position that awards for intangible damages were immune from factual-sufficiency review; once some mental anguish was shown, any damage award was factually sufficient.[27] The Texas Supreme Court rejected this approach, and demanded that appellate courts conduct a more meaningful review.[28]

But the Court did not suggest how.[29] Dean Powers and Professor Ratliff suggest judges should compare a jury's award with awards in similar cases.[30] Schindler urges us to do so, pointing us to cases involving larger injuries but smaller verdicts. Some of our sister courts have taken this approach.[31]

Putting aside the macabre prospect of comparing one plaintiff's misfortune to another's, there are numerous problems with applying this approach at the appellate level. Reported appellate opinions are not

---

**26.** William Powers, Jr. and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.R. 515, 565–68 (1991).

**27.** *See Brown v. Robinson,* 747 S.W.2d 24, 26 (Tex.App.—El Paso 1988, no writ).

**28.** *Saenz v. Fidelity & Guaranty Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996).

**29.** Indeed, the Court has never addressed *Larson* in the context of intangible damages; *Larson* itself concerned only the market value of corporate stock. *Larson,* 730 S.W.2d at 642. And without factual-sufficiency jurisdiction itself, the Court can hardly lead by example.

**30.** *Another Look,* at 567.

**31.** *See, e.g., Southwestern Bell Telephone Co. v. Garza,* 58 S.W.3d 214, 234–36 (Tex.App.— Corpus Christi 2001, no pet.) (refusing remit-

titur by comparing jury award of $300,000 for past mental anguish with other cases awarding $180,000 and $125,000); *Lee Lewis Const., Inc. v. Harrison,* 64 S.W.3d 1, 15–16 (Tex.App.—Amarillo 1999), *aff'd,* 45 Tex. Sup. Ct. J. 232, 2001 WL 1820039 (2001) (ordering remittitur for factual insufficiency after comparing $500,000 award for 4 seconds of anguish while worker plummeted to the ground with awards in other cases of $10,000 for 5 seconds of anguish before death by electrocution, $20,000 for less than a minute of anguish as plane fell to earth, $600,000 for fifteen minutes of suffering after being struck by·a truck, $65,000 found excessive for anguish while drowning, and $40,000 found excessive by $30,000 for 10 minutes of anguish before death in fire).

a representative sample of all verdicts in the state. No appellate record, much less any appellate opinion, can catalog all the facts that may distinguish one trial from another. And it seems problematic to limit one family's verdict by a verdict in a trial somewhere else in which they could not participate.

But trial judges typically see more jury verdicts than we do, because many verdicts are never appealed. Because their jurisdiction is smaller, they can compare a jury's award with others locally, applying a community standard unfamiliar or unknown to us. They may also be privy to settlements in the vast majority of cases that are resolved before trial. And, as mentioned, they see the intangibles that may affect a verdict but never appear in the trial record.

Reviewing awards for intangible damages will never be easy, but trial judges have more tools at their disposal than we do. In this case, the jurors admitted making a mistake in their verdict, and an experienced trial judge reduced it by remittitur. Even the appellees do not challenge most of what he did. But on the three reductions they do challenge—all intangible damages—the panel uniformly disregards the remittitur and restores the numbers the jury (probably mistakenly) wrote. I hope the Texas Supreme Court will reconsider whether, at least as to intangible damages, some room ought to be left for a trial judge's discretion.

### Considering the Constitution

As an intermediate appellate court, we cannot disregard *Larson* merely because it requires us to measure the intangible, or ignore what happened at trial. But there is more than one court above us. And that higher Court's precedent suggests factual-sufficiency review in this case may be an error of constitutional dimension.

In *Pacific Mutual Life Insurance Co. v. Haslip,*[32] the United States Supreme Court affirmed an Alabama general verdict containing both compensatory and punitive damages. Thus there appears to be nothing intrinsically unconstitutional in a combined award of compensatory and punitive damages, at least when the probable amount of punitive damages can be discerned.[33] But the Court approved the punitive damage award in that case based on three procedural protections:

- jury instructions limited the jury to punitive damages that would deter and punish rather than compensate, and informed them that imposition was not compulsory;

- post-verdict rules required the trial judge to state reasons for affirming or reducing the punitive award; and,

- detailed appellate review provided a definite and meaningful constraint on the jury's discretion in awarding punitive damages.[34]

Because of these procedural protections, the punitive damages awarded in that case did not "cross the line into the area of constitutional impropriety."[35]

But in this case, these procedural protections have each been thwarted. The jurors received proper instructions, but admitted they didn't follow them. Detailed appellate review is limited by the factual-sufficiency standard under *Larson*. Finally, although the trial judge stated no reasons for the remittitur, his across-the-

---

**32.** 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

**33.** 499 U.S. at 6 n. 2, 111 S.Ct. at 1032 n. 2.

**34.** 499 U.S. at 19–22, 111 S.Ct. at 1044–46.

**35.** 499 U.S. at 24, 111 S.Ct. at 1046.

board cut suggests something tainted all the damage awards (such as "sending a message"), not that the evidence supporting a few of them was weak. If, as appears likely, he ordered remittitur because punitive damages were awarded without the protections required by state and perhaps constitutional law,[36] factual-sufficiency review requires us to undo that result.

### Conclusion

The parties have not addressed these constitutional questions. In its post-verdict motions and on appeal, Schindler never argues that punitive damages masquerading as compensatory damages are "unconstitutional." But it does claim they are "inappropriate," "unfair," "deplorable," "fundamental error," "out of synch," a "clear violation of Texas statutes," "extraordinarily improper," "incurable," "excessive," and "violated the public policy and legislative mandates underlying bifurcated trials and exemplary damages."

We must liberally construe Schindler's brief, and address all points to which it directed our attention.[37] In some circumstances, we must address constitutionality if it is obvious and apparent, even if the parties leave it unmentioned.[38] Thus, I would grant Schindler's motion for rehear-

ing en banc to consider: (1) whether application of factual-sufficiency review in this case is unconstitutional; and, (2) whether Schindler has preserved any such claim.

RICHARD H. EDELMAN, Justice,
concurring on denial of rehearing en banc.

The dissenting opinion on motion for rehearing en banc raises issues far more fundamental than those which it addresses:

1. How important is it to our system of justice that decisions be reached in an impartial manner, *i.e.*, based on the issues, law, and evidence presented rather than other considerations?

2. What could suggest a greater lack of impartiality than to decide a case based on a change in the law on an issue not raised by either party?

KEM THOMPSON FROST, Justice,
concurring on denial of rehearing en banc.

I write separately to respond to the dissenting opinion on the denial of rehearing en banc. A majority of the en banc court voted not to reconsider the panel's decision en banc.[1] *See* Tex.R.App. P. 49.7. That decision is compelled by the exacting standard for en banc review imposed by the Texas Rules of Appellate Procedure.[2]

---

**36.** Although the Texas Supreme Court has reserved the question whether these procedural safeguards are required by the United States or Texas Constitutions, it has nevertheless stated they are necessary to "ensure against excessive or otherwise inappropriate awards." *Moriel*, 879 S.W.2d at 29.

**37.** Tex.R.App. P. 38.1(e); *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 843 (Tex.App.—Houston [14th Dist.] 2000, pet. denied); *see also Hellman v. Mateo*, 772 S.W.2d 64, 66 (Tex.1989) (holding assertion of discovery rule preserved claim that Article 4590i's strict two-year statute of limitations was unconstitutional).

**38.** *Smith v. Decker*, 158 Tex. 416, 312 S.W.2d 632, 636 (Tex.1958); *Smith v. Costello*, 861

S.W.2d 56, 58 (Tex.App.—Fort Worth 1993), *writ withdrawn by agreement*, 884 S.W.2d 772 (Tex.1994).

**1.** "An en banc court consists of all members of the court who are not disqualified or recused and ... any members of the panel who are not members of the court but remain eligible for assignment to the court." Tex. R.App. P. 41.2(a).

**2.** *See S & L Restaurant Corp. v. Leal*, 883 S.W.2d 221, 237 (Tex.App.—San Antonio 1994) (Hardberger, J., concurring in denial of en banc review) (stating case did not meet "exacting standard" of the rule), *rev'd*, 892 S.W.2d 855 (Tex.1995).

En banc review at the intermediate appellate courts was instituted to maintain uniformity of a court's decisions as a single, unitary body, even though the court may sit in panels. *See O'Connor v. First Court of Appeals,* 837 S.W.2d 94, 96 (Tex. 1992) (discussing promulgation of Rule 79, predecessor to current en banc rehearing rule, after constitutional amendment authorized increase in size of intermediate courts and allowed courts to sit in panels of three). Rule 41.2 of the Texas Rules of Appellate Procedure governs the decision to grant a motion for rehearing by an en banc court. Tex.R.App. P. 41.2. The portion of that rule relevant here provides:

> (c) *En banc consideration disfavored.* En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration. . . .

Tex.R.App. P. 41.2(c).[3]

Appellant's motion for rehearing en banc did not address the standard for en banc review as set forth in Rule 41.2(c). Appellant did not cite to a direct conflict between the panel opinion and any other opinion of this court.[4] Thus, en banc review is not required in this case to maintain uniformity of our decisions.

Appellant also failed to delineate the extraordinary circumstances that necessitate review by the en banc court. While our learned Chief Justice asserts that the issues he discusses in the dissenting opinion to the denial of en banc review are important, they are not the focus of appellant's motion for rehearing. Indeed, the Chief Justice acknowledges that appellant did not mention the constitutional questions the dissenting opinion raises. Instead, the motion presented two points of error that, while related to the discussion in the dissenting opinion, concentrated on the jury argument but failed to specifically attack the holding in the panel opinion that the trial court erred in remitting part of appellees' damages.[5] Appellant argued the jury argument was incurable, obviating the necessity for an objection, and that the argument caused the jury to award excessive damages. Appellant did not challenge the factual sufficiency review of the remitted damages.

Any motion for rehearing is required to "clearly state the points relied on for the rehearing." Tex.R.App. P. 49.1. Absent an extraordinary situation, such as an intervening ruling from this court or a higher court that directly impacts the panel's opinion, the decision whether to grant en banc review should be based upon the points asserted in the motion for rehearing. Furthermore, the party seeking en banc review should set forth the specific reasons why the case meets the standard for such review.

Whether a majority of the en banc court may disagree with all or a part of a panel opinion is not the standard for en banc review. Neither is an assertion that an issue is "important" sufficient. Rather, the rules promulgated by the Texas Supreme Court require that extraordinary

---

3. The language in this portion of Rule 41.2 is nearly identical to that in the former rule.

4. Appellant noted only that *Gannett Outdoor Co. of Texas v. Kubecaka,* 710 S.W.2d 79 (Tex. App.—Houston [14th Dist.] 1986, no writ), which was cited in the panel opinion, should not control the outcome in this case.

5. Appellant raised three issues in the motion: (1) to request punishment in the compensatory damages phase constitutes incurable jury argument; (2) the actual damages are excessive and infected by incurable argument; and (3) unqualified expert testimony on causation was erroneously admitted.

circumstances exist before ordering en banc review when there is no conflict among panel decisions. The issues before the panel in this case are important, but the appellant has not met the heightened criterion imposed in the rule.[6]

For these reasons, I respectfully concur with the majority decision to deny rehearing en banc.

CHARLES W. SEYMORE, Justice, concurring on denial of rehearing en banc.

I write separately in response to Chief Justice Brister's dissent. Notwithstanding Judge Brister's ruminations about matters outside the appellate record, I agree with his evaluation of events that resulted in consideration and assessment of punitive damages by a misinformed jury. However, there is no claim that the panel's opinion conflicts with another opinion rendered by this court. The issues raised by appellant for en banc consideration do not amount to "extraordinary circumstances" prerequisite to review en banc. TEX.R.APP. 41.2(c). Accordingly, I concur with the majority decision to deny rehearing en banc.

---

**6.** *Cf. Willover v. State,* 38 S.W.3d 672, 684 (Tex.App.—Houston [1st Dist.] 2000, pet. granted) (Taft, J., dissenting) (*"The panel opinion's holding effectively turns the prevailing rule, 180 degrees around, to overturning a trial court's ruling on appeal if such ruling is incorrect for a reason not previously mentioned either at trial or on appeal. I find this beyond extraordinary."*) (emphasis in original); *Crest-way Care Center, Inc. v. Berchelmann,* 945 S.W.2d 872, 873 n. 2. (Tex.App.—San Antonio 1997, orig. proceeding) (explaining that extraordinary circumstances for en banc review were satisfied when majority disagreed with panel's interpretation of law and its decision to issue extraordinary remedy of mandamus, which is reserved for manifest and urgent necessity).