Affirmed and Memorandum Opinion filed June 15, 2006









Affirmed
and Memorandum Opinion filed June 15, 2006.

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-05-00348-CV

____________

 

IN THE INTEREST OF T.S. AND S.A.S.,
CHILDREN

 



 

On Appeal from the 300th
District Court

Brazoria County, Texas

Trial Court Cause No. 28992

 



 

M E M O R A N D U M   O P I N I O N

Ashley Wilson=s parental rights
to her two children, T.S. and S.A.S, were terminated after a jury trial.  She appeals, arguing the trial court erred by
denying her request for a directed verdict, and refusing to submit a jury
question on joint managing conservatorship. 
She also contends the evidence is factually and legally insufficient.  We affirm.

Factual
Background

The State took custody of Wilson=s children after
receiving a report Wilson was in jail and had left her three-year-old son,
T.S., with friends who could no longer care for him.  When a caseworker interviewed Wilson in jail,
she discovered Wilson also had a two-year-old daughter, S.A.S., who had been
living with an Aaunt@ for nineteen
months.








Facts Concerning T.S.

In late April 2004, Wilson, who admitted
to daily cocaine use until May of 2004, discovered she had a warrant for her
arrest.[1]  Because Wilson was allegedly Avery concerned@ about what would
happen if T.S. was with her when she was arrested, she left him with her
friends, David Perez and Colleen Parker, whom she had known for about two
years.  Wilson left T.S. with Aa couple of
outfits,@ and Perez and
Parker said they would provide T.S.=s meals Afor the time
being.@  Wilson arranged for her mother to travel from
Oklahoma to pick up T.S. because she intended his stay with Perez and Parker to
be temporary.  The police went to Perez
and Parker=s home searching for Wilson sometime after
she dropped off T.S.  Because Perez and
Parker promised the police they would call if Wilson came to visit T.S., she
did not visit her son.  Instead, she
called to check on him and had another friend give clothes, food, and money to
Perez for T.S.=s care. 
Wilson claims she did not turn herself in because she was waiting for
her mother to pick up T.S.  Wilson=s mother never
arrived.

Wilson was arrested on May 20, 2004.  When Perez and Parker heard Wilson was in jail,
they called Brazoria County Children=s Protective
Services (CPS) and asked CPS to take T.S.; he had lived with them for
approximately three weeks.  A CPS
caseworker visited Wilson in jail. 
Visibly upset, Wilson told the caseworker T.S. had a little sister who
was living with an Aaunt,@ but the aunt did
not want T.S.  She gave the caseworker
Perez= address, and told
her about other possible placements for T.S.[2]








CPS picked up T.S. from Perez= home on May 21,
2004.  The caseworker described the home
as an inappropriate placement with debris and mud in the yard and men drinking
in the driveway.  She said T.S. was barefoot
and covered in dirt from playing outside. 
His underwear was grayish in color, there were small cuts on his feet,
arms and face, and he had large ringworms on his legs that had scabbed
over.  The caseworker was unable to
interview T.S. at the time because he was busy playing in the mud.  She stated that, once T.S. got into her car,
he said, ADamn, that was really hard work.@  CPS placed T.S. in foster care.

Facts Concerning S.A.S.

In October of 2002, one week after S.A.S.=s first birthday,
Wilson phoned Denise Sambrano, a longtime friend of Wilson=s mother.  Wilson told Mrs. Sambrano she could no longer
care for S.A.S., and asked Mrs. Sambrano to take the girl.  Wilson did not mention T.S. to Mrs. Sambrano
at this time.  Although Mrs. Sambrano had
just remarried, she and her husband agreed to take S.A.S.

When Mrs. Sambrano arrived to retrieve S.A.S., she noticed
four or five men sitting on the couch inside the apartment while she stood
outside.  She also smelled Aburnt tar@ coming from
inside, which she believed was the odor of crack cocaine.  Wilson carried S.A.S. to Mrs. Sambrano and
offered to retrieve S.A.S.=s belongings.  Mrs. Sambrano declined and said she would
care for the baby and Wilson needed to get her life together.  Mrs. Sambrano testified she wanted to get
S.A.S. away from that situation.  Almost
two months later, Wilson and Mrs. Sambrano each signed a handwritten, notarized
document that read:

I, Ashley Wilson leave my daughter
[S.A.S.] to the care & custody of Denise Z. Sambrano.

Date 12-12-02

S.A.S. lived with Mrs. Sambrano and her husband for
nineteen months.  Wilson visited between Aa few@ and Aten@ times.  During this time, Mrs. Sambrano testified she
took care of T.S. twice for a couple of days. 
Once, Wilson=s mother dropped him off without shoes or
socks and in clothes that looked as though he had Aslept in them for
two days.@








CPS removed S.A.S. from the Sambrano home
just days after T.S.=s removal from the Perez and Parker
home.  The only reason CPS gave for
taking S.A.S. was that Mrs. Sambrano did not have legal custody and could not
authorize the child=s medical treatment.[3]  One caseworker testified the clothes S.A.S.
brought with her were too big; Mrs. Sambrano said she allowed S.A.S. to take
whatever she wanted when she left. 
S.A.S. also brought a sippy cup with soda in it and Athere was molding
around the cup.@ 
CPS placed S.A.S. with her brother in foster care.[4]

Wilson testified at trial that she could
not decide Aright now@ whether she
should give Mrs. Sambrano full custody of S.A.S.  Wilson admitted that, two months before
trial, she told Mrs. Sambrano to take S.A.S. because Ayou=re her mommy,@ but then also told
Mrs. Sambrano AI need [T.S.]@ and T.S. is Amy heart.@   Although Wilson denied her comments to Mrs.
Sambrano constituted a custody agreement, she testified it was her intent, when
she made these comments, to give Mrs. Sambrano full custody of S.A.S.

Procedural
Background








The Texas Department of Family Protective Services (TDFPS)[5]
sought to terminate Wilson=s parental rights
on seven statutory grounds, including child abandonment and endangerment.  Tex.
Fam. Code Ann. ' 161.001(A)B(E), (K), (O)
(Vernon 2002).  At the close of trial,
only four grounds were submitted to the jury, alleging Wilson:

(A) voluntarily left her children
alone or in the possession of another not the parent and expressed an intent
not to return;

(C) voluntarily left her children
alone or in the possession of another without providing adequate support of the
children and remained away for a period of at least six months;

(D) knowingly placed or knowingly
allowed the children to remain in conditions or surroundings which endanger the
physical or emotional well-being of the children;

(E) engaged in conduct or knowingly placed the children
with persons who engaged in conduct which endangers the physical or emotional
well-being of the children.

Id. ' 161.001(A), (C)B(E).  The jury found, by clear and convincing
evidence, that Wilson endangered both children under ground (E), and that
termination was in the children=s best
interests.  The jury also found Wilson
abandoned S.A.S. under ground (A), and endangered T.S. under ground (D).  The trial court terminated Wilson=s parental rights
to both children and denied her subsequent motion for new trial.  Wilson appeals, challenging (1) the trial
court=s denial of her
motion for directed verdict, (2) the trial court=s refusal to
submit a jury question on joint managing conservatorship, and (3) the factual
and legal sufficiency of the evidence supporting termination ground (E), as
well as of evidence that termination is in her children=s best interests.

Standard of Review and Applicable Law








The natural right
existing between a parent and child involves fundamental Constitutional
rights.  Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  This natural
right is Aessential,@ a Abasic civil right
of man,@ and is Afar more precious
than property rights.@  Id.
(quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972)).  A termination decree is final and
irrevocable.  Id.  It divests the parent-child relationship for
all time, as well as all legal rights, privileges, duties, and powers between
the parent and child, except the child's right to inherit.  Id. 
There must, therefore, be clear and convincing evidence to support
termination before a court may involuntarily sever this relationship.  Santosky v. Kramer, 455 U.S. 745, 747
(1982);  Richardson v. Green, 677
S.W.2d 497, 500 (Tex. 1984). 
Consequently, termination proceedings should be strictly scrutinized,
and involuntary termination statutes are strictly construed in favor of the
parent.  Holick, 685 S.W.2d at 20B21.

Directed Verdict

At the close of TDFPS= case, Wilson=s attorney moved
for a directed verdict,  claiming Athe Petitioner has
not proved by clear and convincing evidence that [Wilson] knowingly placed
these children in a place or with a person that was a danger to them.@[6]  The attorney ad litem agreed with Wilson=s counsel and
argued TDFPS did not prove Wilson voluntarily placed the children in a Adangerous
position.@ 
The attorney ad litem asked for a directed verdict A[a]t least as to
[S.A.S.].@ 
TDFPS replied that this was one ground of many upon which they sought
termination, there was evidence T.S. was knowingly placed in endangering
surroundings, and that S.A.S. was left with caregivers who had no authorization
to provide for her medical care.  The
trial judge denied Wilson=s motion.








In her first issue, appellant contends the
trial court erred in denying her request for a directed verdict.  A trial court may direct a verdict when a
plaintiff fails to present evidence raising a fact issue essential to the
plaintiff=s right of recovery.  Prudential Ins. Co. of Am. v. Fin. Review
Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). 
We review a trial court=s action on a
motion for directed verdict just as we do a claim of legally insufficient
evidence.  City of Keller v. Wilson,
168 S.W.3d 802, 823 (Tex. 2005).  We Alook at all
evidence in a light most favorable to the finding and determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its
finding is true.@  In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). 
If we find no fact finder could have done so, we must conclude the
evidence is legally insufficient.  Id.

After reviewing the record, we find there
is legally sufficient evidence Wilson knowingly placed or knowingly allowed her
children to remain in conditions or surroundings endangering their physical or
emotional well-being.  Wilson admitted to
using cocaine daily prior to her arrest in May of 2004, and admitted that she
has not had one day of sobriety outside of prison.  Wilson testified she was the children=s main caregiver
when they were born, and she cared for them during the day and evening.  Mrs. Sambrano smelled what she believed was
crack cocaine when she picked up S.A.S. from Wilson=s apartment.  Wilson left T.S. with Perez and Parker in
dirty and possibly dangerous conditions. 
When CPS picked up T.S., he was filthy, barefoot, his underwear was Agrayish,@ he had small cuts
on his feet and face (that did not require band-aids), and large ringworms on
his legs.  Another caseworker testified
T.S. played with roaches that crawled out of a bag of his stuffed animals taken
to his foster home.  We find legally
sufficient evidence supports termination ground (D), and we overrule Wilson=s first issue.

Jury Question on Joint Managing Conservatorship

In her second issue, Wilson argues the
trial court erred by refusing to submit a jury question on joint managing conservatorship.[7]  At the charge conference, Wilson sought to
submit a jury question asking who should be appointed joint managing
conservators of the children:  TDFPS and
Wilson, TDFPS and the Sambranos, or the Sambranos and Wilson.  No pleading raised this issue.  However, the trial court stated:








[T]he issue has essentially been tried by consent with
regard to other parties, the Sambranos. 
But I don=t think I would give the jury a charge on
the Sambranos.  Not under the testimony
that we have in this case.  First place,
it=s obvious that
[Wilson]=s in jail, but
then, there would also have to be an issue on who would establish the primary
residence.  And it would not be her.

The attorney ad litem suggested the jury or the
parties could determine primary residence, but the trial court refused to
submit any issue on joint managing conservatorship.

Joint Managing Conservatorship

Persons appointed as joint managing conservators share
parental rights and duties.  London v.
London, 94 S.W.3d 139, 149 (Tex. App.CHouston [14th
Dist.] 2002, no pet.).  They are usually,
though not necessarily, the parents, and the exclusive right to make particular
decisions may be awarded to only one party in this kind of relationship.  Tex.
Fam. Code Ann. ' 101.016 (Vernon 2002).  Joint managing conservatorship is generally
presumed to be in the best interest of the child when determining
conservatorship incident to a divorce.  Bates
v. Tesar, 81 S.W.3d 411, 421B22 (Tex. App.CEl Paso 2002, no
pet.).  This is consistent with Texas
public policy seeking to:

(1) 
assure that children will have frequent and continuing contact with
parents who have shown the ability to act in the best interest of the child;

(2) provide a safe, stable, and
nonviolent environment for the child; and 

(3) encourage parents to share in the rights and duties of
raising their child after the parents have separated or dissolved their
marriage.

Tex. Fam. Code Ann. ' 153.001(a)
(Vernon 2002).  

The Texas Family Code chapter providing
for involuntary termination of the parent-child relationship only mentions
appointment of a managing conservator following termination.  It does not mention joint or sole managing
conservatorship status.  Tex. Fam. Code Ann. '' 161.001B161.211 (Vernon
2002 & Supp. 2004B05). 
We, therefore, must turn to Texas Family Code chapter 153 to gain
insight on when joint managing conservatorship may be granted.  








Joint managing conservatorship does not
generally apply to parental termination cases. 
First, a parent against whom termination is sought can only be appointed
a joint managing conservator if the petitioner fails to prove its caseCthat is, if that
parent=s rights cannot be
severed.  See id. ' 161.205 (Vernon
2002) (requiring trial court to either deny the petition or Arender any order
in the best interest of the child@ if the trier of
fact does not terminate the parent-child relationship).  Second, in an original suit for
conservatorship, possession, and access, a court may not appoint joint managing
conservators if credible evidence is presented of a history or pattern of past
or present child neglect, or of physical or sexual abuse by one parent directed
against the other parent, a spouse, or a child. 
Id. ' 153.004(b) (Vernon Supp. 2005); see
also In re N.J.G., 980 S.W.2d 764, 766 n.1 (Tex. App.CSan Antonio 1998,
no pet.) (noting Texas Family Code section 161.205 is usually interpreted with
regard to the section 153.131(a) presumption that a parent shall be appointed
sole managing conservator or both parents as joint managing conservators unless
the child=s physical health or emotional development
would be significantly impaired; considering also section 153.004 precluding
joint managing conservator status when there is credible evidence of a history
or pattern of child abuse or neglect). 
In fact, a parent=s unsupervised visitation with a child is
presumed to be against the child=s best interest if
there is credible evidence that parent has a history or pattern of child abuse
or neglect.  Tex. Fam. Code Ann. ' 153.004(e).

Standard of Review for Jury Charge Error








We review the submission of jury questions
for an abuse of discretion.  Varme v.
Gordon, 881 S.W.2d 877, 881 (Tex. App.CHouston [14th
Dist.] 1994, writ denied).  A trial court
must submit all questions, instructions and definitions to the jury raised by
the written pleadings and any evidence.  Tex. R. Civ. P. 278; Elbaor v. Smith,
845 S.W.2d 240, 243 (Tex. 1992).  A trial
court may not submit a jury question that is neither supported by the pleadings
nor tried by consent.  Recognition
Commc=ns, Inc. v. Am. Auto. Ass=n, Inc., 154 S.W.3d 878,
885B86 (Tex. App.CDallas 2005, pet.
denied); Tex. Indus., Inc. v. Vaughan, 919 S.W.2d 798, 803 (Tex. App.CHouston [14th
Dist.] 1996, writ denied).  To do so is
an abuse of discretion.  Stephanz v.
Laird, 846 S.W.2d 895, 902 (Tex. App.CHouston [1st
Dist.] 1993, writ denied).

No pleading raised the issue of joint
managing conservatorship.  When issues
are not raised by the pleadings but are tried by either express or implied
consent of the parties, Athey shall be treated in all respects as
if they had been raised in the pleadings.@  Tex.
R. Civ. P. 67.  To determine
whether an issue was tried by consent, A>we must examine
the record not for evidence of the issue, but rather for evidence of trial
of the issue.=@  Johnston v. McKinney Am., Inc., 9
S.W.3d 271, 281 (Tex. App.CHouston [14th
Dist.]  1999, pet. denied) (quoting Libhart
v. Copeland, 949 S.W.2d 783, 797 (Tex. App.CWaco 1997, no
writ)).  (emphasis in original).  Trial by consent A>is intended to
cover the exceptional case where it clearly appears from the record as a whole
that the parties tried the unpleaded issue. It is not intended to establish a
general rule of practice and should be applied with care, and in no event in a
doubtful situation.=@  Stephanz, 846 S.W.2d at 901(quoting Jay
Fikes & Assoc. v. Walton, 578 S.W.2d 885, 889 (Tex. Civ. App.CAmarillo 1979,
writ ref=d n.r.e.)).  Trial by consent is inapplicable when
evidence relevant to an unpleaded matter is also relevant to a pleaded issue
because admitting the evidence is not calculated to elicit an objection and,
therefore, does not demonstrate a Aclear intent@ by all parties to
try the unpleaded issue.  See In re
J.M., 156 S.W.3d 696, 705 (Tex. App.CDallas 2005, no
pet.) (stating evidence of unpleaded issue applied also to whether termination
was in children=s best interests).

Analysis








We cannot say the parties impliedly
consented to trying whether joint managing conservatorship should be granted between
the Sambranos and a party to this suit. 
All evidence concerning the propriety of the Sambranos= home went equally
to the issue of termination because TDFPS alleged, inter alia, that Wilson
knowingly placed or allowed her children to remain in conditions or
surroundings endangering to their physical or emotional well-being.  Evidence regarding the Sambranos= continued desire
to adopt the children and their progress with TDFPS to gain custodyCincluding
completion of a home study and psychological evaluationCwas relevant to
whether they should be named sole managing conservators of the children.  TDFPS, in its petition seeking termination in
the event the children could not be safely returned to a parent, requested the
appointment of itself, a relative, or other suitable person as the children=s sole managing
conservator.  The trial court submitted a
jury question on sole managing conservatorship.

There is also no evidence that the
Sambranos, Wilson, or TDFPS would consider or be able to share parental rights
and duties as required between joint managing conservators.  Instead, evidence at trial showed repeated
miscommunications between TDFPS and the Sambranos, and the court-appointed
child advocate (ACASA volunteer@) testified she
believed TDFPS was being Aobstructive@ in the Sambranos= attempts to visit
the children.  Mrs. Sambrano, when asked
by TDFPS= attorney whether
she was frustrated with TDFPS, replied, ABy you.  Hit to the head.@  Mrs. Sambrano testified she would like to
adopt the children, and she understood to do so meant their parents= rights must be
terminated.  She also testified she
understood, if and when she adopted the children, Wilson would be allowed no
contact with her children.[8]

Neither party pled for joint managing
conservatorship, and after fully examining the record, we find this issue was
not tried by consent.  We find the trial
judge did not abuse her discretion in refusing to submit this jury question,
and we overrule Wilson=s second issue.

Sufficiency of the Evidence








Wilson, in her
final issue, challenges the legal and factual sufficiency of the evidence
supporting the jury=s finding Wilson engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endangers their physical or emotional well-being.[9]  Tex.
Fam. Code Ann. ' 161.001(E).  She also challenges the legal and factual
sufficiency of the evidence showing termination is in her children=s best interests.

As discussed above, the jury found a total
of three statutory grounds for termination: 
the endangerment ground (E) as to both children, (D) as to T.S., and
abandonment ground (A) as to S.A.S. 
Assuming without deciding there is legally insufficient evidence of
termination ground (E), Wilson cannot show reversible error by challenging only
ground (E) when she has not raised evidentiary challenges to the other grounds
for termination.  Tex. R. App. P. 44.1(a). 
Therefore, we do not address her evidentiary challenge to subsection
(E).  We look only to the sufficiency of
the evidence supporting the jury=s finding that
termination is in the best interest of the children.

Standard of Review and Applicable Law

In a legal sufficiency review, we Alook at all
evidence in a light most favorable to the finding and determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its
finding is true.@  J.F.C.,
96 S.W.3d at 266.  We assume disputed
facts were resolved in favor of the verdict if it is reasonable to do so, and
we disregard all evidence that could be reasonably disbelieved.  Id. 
This does not mean we disregard all evidence that does not support
the findingCdoing so could skew our analysis.  Id. 
If we find no fact finder could have formed a firm belief or conviction
that its finding is true, we must conclude the evidence is legally
insufficient.  Id. 








In a factual sufficiency review, we give
due consideration to evidence the jury could reasonably have found to be clear
and convincing, and we examine whether this evidence is such that a reasonable
fact finder could form a firm belief or conviction the allegations are true.  Id. 
We consider whether the disputed evidence is such that the jury
could reasonably resolve it in favor of its finding.  Id. 
If, in light of the entire record, the disputed evidence that cannot
have reasonably been credited in favor of the finding is so significant that
the fact finder could not have reasonably formed a firm belief or conviction in
favor of termination, we must find the evidence is factually insufficient.  Id.

There is a strong presumption a child=s best interest is
served by staying with the natural parent, and the burden is on TDFPS to rebut
that presumption.  In re U.P., 105
S.W.3d 222, 230 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied).  For the trier
of fact to determine whether this presumption is rebutted, it must consider
many issues, such as:  (1) the child=s desires, (2) the
present and future emotional and physical needs and dangers to the child, (3)
parenting abilities involved, (4) programs available to help the parent, (5)
TDFPS= plans for the
child and the stability of the proposed placement, (6) any of the parent=s acts or
omissions indicating the relationship is not a proper one, and (7) whether
there is any excuse for those acts or omissions.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).
This list is not exhaustive, nor is evidence required on each listed
factor.  U.P., 105 S.W.3d at 230.

The Children=s Desires








The children are too young to express
their wishes on this issue.  There is no
evidence about the children=s relationship
with their mother.  The record shows
S.A.S. lived with the Sambranos for nineteen months, during which time her
mother visited between Aa few@ and Aten@ times.  Wilson admitted she told Mrs. Sambrano to
keep S.A.S. because she is S.A.S.=s Amommy.@  The children=s second foster
father testified the term Amother@ is general to
T.S., and that T.S. called his foster mother Amother.@  The foster father also stated neither child
is aware Wilson is their mother.  Because
Wilson was in jail, she had not visited with her children for at least nine
months prior to trial, although she did write three letters from jail asking
about them.  This evidence weighs in
favor of the jury=s best interests finding.

The Present and Future Emotional and Physical
Needs and Dangers to the Children

The second foster father described T.S. as
a normal four-year-old boy, and S.A.S. as a shy, three-year-old girl.  He also described both children as confused
and angry.

Children need permanency and
security.  U.P., 105 S.W.3d at
230.  At the time of trial, Wilson was in
prison and unable to provide any home for her children.  Although a parent=s imprisonment, by
itself, is not a ground for termination, a parent=s imprisonment or
voluntary absence from her children=s lives can
negatively impact their emotional well-being. 
See In re S.M.L., 171 S.W.3d 472, 478B79 (Tex. App.CHouston [14th
Dist.] 2005, no pet.) (stating incarcerated parents are absent from child=s daily life and
child=s living
environment and emotional well‑being can be negatively impacted when
parent repeatedly commits criminal acts subjecting him to possibility of
incarceration).  Knowing she would still
be in prison at the end of trial, Wilson testified she wanted her children to
stay with the Sambranos.  There is little
evidence of any physical or emotional problems or delays with either
child.  There is, however, evidence T.S.
was left in a temporary living situation for almost a month that CPS described
as Ainappropriate,@ was not bathed or
properly clothed on more than one occasion, and had large ringworms on his
legs.  S.A.S. seemed happy and
well-adjusted while living with the Sambranos. 
There is evidence her later removal into foster care was difficult.  She also cried for hours after TDFPS= abrupt decision
to return the children to foster care on the same day they were supposed to
move to the Sambranos= home. 
T.S., who was described as Aman-like,@ was angry when
this happened.  Permanency is crucial to
these children=s lives, and Wilson has not shown she can
provide such permanency.  This factor
also weighs in favor of the jury=s finding.








Parenting Abilities Involved

At trial, Wilson admitted to daily drug
use outside of prison.  There is evidence
she often left her children with othersCher sister refused
to be Astuck@ with the children
Aagain@ when they were
taken into CPS custody, S.A.S. had lived with the Sambranos for a year and a
half, and T.S. stayed with Perez and Parker for at least twenty days.  Mrs. Sambrano testified she knew Wilson=s drug use to be
extensive Aoff and on,@ and Athat type of
environment@ is not suitable for any child.

Wilson=s criminal history
includes several charges between November of 2002 and May of 2004, including
criminal trespass, evading arrest, tampering with a government record (when she
gave her sister=s name to the police instead of her own),
fleeing a police officer, and possession of a controlled substance.  Wilson testified she has never worked and has
relied on boyfriends for drug money in the past.  Two months before trial, Wilson told Mrs.
Sambrano to take S.A.S. as her own child. 
At the same time, Wilson said she Aneeds@ T.S., and T.S. is
her Aheart.@  There are two reports of physical neglect by
Wilson against T.S., one in May of 2001 and one in April of 2003.  CPS 
was Aunable to determine@ any abuse when it
investigated the May of 2001 report and, in April of 2003, CPS was unable to
investigate a report of abuse phoned in by Mrs. Sambrano because Wilson had
moved.

The most favorable evidence of Wilson=s parenting
abilities is that she attempted to find other homes for her children.  We find this factor also weighs in favor of
the jury=s best interests
finding.

Programs Available to Help the Parent








CPS did not offer Wilson any services
because she was incarcerated.  Wilson was
scheduled for release from jail seven months after the trial, in September of
2005, and expected to live in a halfway house for three months before being
free to live on her own.  In jail, Wilson
participated in substance abuse and parenting classes and started working to
obtain her GED.  She testified she loves
her children, and she wrote letters from jail to ask how they were doing and to
ask CPS for a copy of her family service plan. 
Although Wilson=s desire to effect a turnaround in her
life is commendable, there is no evidence she has been able to free herself
from her long-term drug dependency in order to provide a safe and stable home
for her children.  See In re M.G.D.,
108 S.W.3d 508, 513 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied) (stating significance of personal turnaround depends
on what turnaround is from and jurors are not required to ignore long history
of drug dependency).  There is also no
evidence she completed any of the programs she said she participated in while
in jail.  This factor weighs in favor of
the jury=s finding.

Wilson=s Acts or
Omissions Indicating the Relationship is Improper and any Excuse for those Acts
or Omissions

Wilson has several arrests and has
violated probation more than once.  Her
continued drug use and criminal activity interfered with her ability to provide
a stable and permanent home for her children. 
She left her children with others and used cocaine on a daily
basis.  Excuses for this behavior are Wilson=s young age and
her drug addiction; however, there is no evidence she has successfully
completed a drug abuse program or made progress in any class she started while
in jail.  There is no evidence showing
she has now escaped the habits that caused her inability to care for her
children.  Therefore, the children=s risk of exposure
to this lifestyle, should they be returned to Wilson, still remains.

TDFPS= Plans for the
Child and the Stability of the Proposed Placement








At the time of trial, TDFPS planned to
complete a full home study on the Sambranos and to require Frank Sambrano to
complete a psychological evaluation before allowing the children to live with
the Sambranos.  Caseworkers and a CASA
volunteer had only positive things to say about the Sambranos= home after
visiting:  it is a clean, child-friendly
home, and the children have exhibited Amany acts of
spontaneous joy@ with the Sambranos.  This is the home S.A.S. knows, and it is
where Wilson wanted her children placed following the termination trial.[10]  The children were not placed with the
Sambranos at the time of trial because TDFPS was investigating concerns raised
before trial, including an allegation Frank Sambrano was physically abusive
with his ex-wife and that Mrs. Sambrano had used drugs.  The CASA volunteer testified both allegations
lacked merit.  An earlier report that
Mrs. Sambrano abused S.A.S. was determined to be unfounded after a CPS
investigation.[11]

We find there is legally and factually
sufficient evidence that termination of Wilson=s parental rights
is in both children=s best interests.  We overrule Wilson=s final issue, and
affirm the trial court=s judgment.

 

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Memorandum Opinion filed June 15, 2006.

Panel
consists of Justices Hudson, Fowler, and Seymore.











[1]  Wilson was
wanted for violating the terms and conditions of her probation.  She was on probation for tampering with a
government document and for possessing cocaine. 
The tampering charge arose when Wilson was arrested previously but
signed her sister=s name in order to hide a warrant for another
probation violation.





[2]  T.S. could not
be placed immediately with Wilson=s mother
because CPS could not obtain sufficient information to perform a background
check on a person living with her in Oklahoma. 
Wilson=s sister refused to be Astuck@ with the children again.





[3]  S.A.S. was
hospitalized one time shortly after Mrs. Sambrano took her in, and later
required medical attention for various childhood illnesses.  In each instance, Mrs. Sambrano obtained
authorization for S.A.S.=s medical care by contacting Wilson or another family
member.  At the time the State removed
S.A.S., Wilson=s whereabouts were known and the State could have
obtained proper medical authorization for any person caring for the girl.





[4]  CPS placed the
children in a foster home, but moved them into a second home soon
thereafter.  The first family complained
S.A.S. was exhibiting sexual behavior which their small children were beginning
to imitate:  they were found mimicking
sexual positions completely nude; S.A.S. would lay on her back with her legs
apart and say AI=m ready@; and at
church S.A.S. was seen taking down her underwear and masturbating.  One caseworker testified S.A.S. was taken for
a sex abuse exam, but the exam was inconclusive.  The caseworker also stated S.A.S.=s genital area was infested with pinworms, and her
behavior was spreading the worms to others. 
The caseworker=s notes also mentioned S.A.S. had a severe urinary
tract infection.





[5]  CPS is a
division of TDFPS.  See Tex. Fam. Code Ann. ' 264.404 (Vernon Supp. 2004B05).





[6]  Although
Wilson=s attorney moved for a directed verdict, she
challenged only endangerment ground (D), and therefore moved only for a partial
directed verdict.  Wilson=s appellate brief argues there was no clear and
convincing evidence at trial she knowingly placed or allowed her children to
remain in conditions endangering their physical or emotional well-being.  This corresponds to subsection (D) of the
termination statute.  Tex. Fam. Code Ann. ' 161.001(1)(D).





[7]  TDFPS argues
Wilson failed to preserve error.  The
exhibits volume of the reporter=s record contains the written question Wilson=s attorney submitted to the trial judge.  The judge marked the question Arefused@ and
signed her name.  Wilson has preserved
this issue for our review.  Tex. R. Civ. P. 278.





[8]  There was some
confusion on this issue, as evidenced by a follow-up question asking Mrs.
Sambrano whether Wilson would be allowed at the house if she adopted the
children.  She answered:  AWould I
be allowed by B who would allow me to.@  TDFPS did not pursue this line of
questioning.





[9]  Appellant=s brief challenges only the evidence supporting the
subsection (E) termination ground by quoting its statutory language.  However, in the argument on this issue, there
is one cursory statement that subsection (D) requires an examination of the
child=s environment to determine whether it is a source of
endangerment.  The argument, then, does
not mention the condition of Perez and Parker=s home
or the large ringworms CPS discovered on T.S.=s
legs.  Because the jury terminated Wilson=s rights under ground (D) to T.S. only, any
evidentiary challenge to ground (D) must concern T.S.  We find Wilson has inadequately briefed any
evidentiary challenge to subsection (D). 
Tex. R. App. P. 38.1(h); Schindler
Elevator Corp. v. Anderson, 78 S.W.3d 392, 409 (Tex. App.CHouston [14th Dist.] 2001, judgm=t vacated w.r.m.).





[10]  TDFPS did, in
fact, place the children with the Sambranos after the termination trial.





[11]  In November of
2003, CPS investigated a report that Mrs. Sambrano abused S.A.S., and concluded
there were no signs of abuse.  In the
investigation, a caseworker spoke with Denise and Frank Sambrano, physically
examined S.A.S. for suspicious marks or bruises, observed S.A.S. in the home
(S.A.S. was described as having Ano fear
of either [Mr. or Mrs. Sambrano] and, if anything, [as being] a bit spoiled@), researched the Sambranos= and Wilson=s
criminal backgrounds, and interviewed Wilson=s sister
(who reported S.A.S. was Abetter off@ with
the Sambranos) and Mrs. Sambrano=s adult
daughter (who said she had no concerns about the way her mother cared for
S.A.S.).  The report concluded the
Sambranos Aare responsible caregivers.@